423 A.2d 385

**Theodore PRATHER, Appellant at No. 2041,**

**v.**

**H–K CORPORATION t/a Mr. Kleen Bar, Appellant at No. 2011.**

Superior Court of Pennsylvania.

Argued March 21, 1979.

Filed Dec. 1, 1980.

Reconsideration Denied Feb. 23, 1981.

Marvin W. Factor, Philadelphia, for appellant (at No. 2041) and for appellee (at No. 2011).

Richard A. Kraemer, Philadelphia, for appellant (at No. 2011) and for appellee (at No. 2041).

Before CERCONE, P. J., and HOFFMAN and WATKINS, JJ.

WATKINS, Judge:

These are cross appeals from the order of the Court of Common Pleas of Philadelphia County. The plaintiff–appellant, Theodore Prather, appeals from the order granting a new trial for damages only when he failed to submit a remittitur of $75,000 which would have reduced the verdict from $225,000 to $150,000. The defendant–appellant, H–K Corporation t/a Mr. Kleen Bar, appeals from the refusal of post–trial motions and the verdict.

This is a trespass action which was tried before the Honorable Charles Wright and a jury. Theodore Prather sued the owner of the bar for failure to protect him as a patron from assault and battery. The jury found for the plaintiff in the amount of $225,000. Motion for a new trial

and judgment, n. o. v., were denied and the court below found that the defendant had a fair trial. However, without stating any reasons or any statement indicating excessiveness, the court ordered the plaintiff to submit a remittitur in the amount of $75,000. Plaintiff refused and the court below granted a new trial for damages only. This appeal followed on behalf of the plaintiff and the defendant appeals from the denial of his post–trial motions. We will first discuss the appeal of the defendant.

The facts are as follows. Theodore Prather, while in the Mr. Kleen Bar, was shot by another patron, known as Brother Quick. The record discloses that John Taylor and a Winnie Pooh and the owner of the taproom "Mr. Kleen" were behind the bar. The assailant Quick handed a brown bag containing a gun to Taylor, who placed the package behind the bar. Quick was a frequent patron, well known to Taylor, and a known trouble maker. On the date of this incident, Quick had been drinking in the bar for several hours. He was annoying other customers and dancers. At one point he entered into an argument with a Thomas Freiler, another patron. After the argument, Quick left the bar. Sometime later he returned and sat on a stool at the bar. He had a brown paper bag in his possession. He walked up to Taylor, the bar tender, and handed him the brown bag. Taylor put it behind the bar. The bag rolled over on the bar as it was handed to Taylor. He took the bag in the palm of his hand in putting it under the bar. Quick continued to annoy patrons at the bar and the dancers by his remarks. He reopened his argument with Freiler. The bar tender at no time tried to check or control his conduct. The argument was face to face and became an altercation. Nothing was done by the bar tender to stop it. The plaintiff then made an attempt to separate them and Quick called to Taylor for the bag. Taylor was at the other end of the bar. Glasses were being smashed and Quick who now went behind the bar, obtained the bag where Taylor had placed it, took out the gun it contained and shot the plaintiff. Quick immediately left the bar.

■ The defendant contends that Taylor was not his employee. Taylor testified that he helped wash dishes and glasses at the bar but that he was not paid for this work and testified that he didn't serve drinks that "he just liked doing things like that". A witness testified that Taylor was on duty behind the bar on many occasions prior to the shooting and that he worked in the afternoons and was known as J.T. This witness also testified that he served drinks and took payment for them. He was behind the bar during the whole time of the trouble that resulted in this law suit. Taylor, himself testified that he was working behind the bar for about a year. During all this noisy altercation, he made no effort to intervene or stop it up to the time of the shooting. Whether Taylor was an employee was a factual matter and the evidence and its credibility was for the jury and this record could and did support a finding that Taylor was an employee of the defendant.

■ This case is governed by *Gombar v. Schaeffer*, 202 Pa.Super. 282, 195 A.2d 527 (1963) which states, "The rule of law defining what the plaintiff had to prove is contained in Paragraph 348 of the Restatement of Torts which provides: 'A possessor of land who holds it out to the public for entry for his business purposes, is subject to liability to members of the public while upon the land for such a purpose for bodily harm caused to them by the accidental, negligent or intentionally harmful acts of third persons or animals if the possessor by the exercise of reasonable care could have (a) discovered that such acts were being done and (b) protected the members of the public by (i) controlling the conduct of the third persons or (ii) giving a warning adequate to enable them to avoid the harm' " . . .

■ J.T. (Taylor) could and should have known that the bag he took from Quick and placed behind the bar contained a gun. The series of arguments and altercations and his knowledge of Quick's propensities for trouble making should have put a reasonable person on notice of impending trouble. As the court below put it: "The jury had before it the several visits made to the taproom by Quick, his boisterous

and discourteous conduct, his drinking throughout his visits and finally his vicious shooting of the plaintiff. The jury could thus conclude that Quick's conduct was sufficient to require more responsible and diligent action by the employees of defendant."

■ The complaints concerning the introduction of drinking into the case is without merit. The court below charged: "Now, I don't believe ladies and gentlemen, although you have heard the testimony that there is sufficient evidence to submit to you on the question of intoxication, whether the parties here were intoxicated." There was no evidence here of intoxication except continuous drinking but the very purpose of the business itself was for drinking. This instruction by the court favored the defendant as it took from the jury any issue that the defendant was serving intoxicated persons.

The contentions of the defendant concerning limitations of examination and cross–examination and prejudicial confrontation between the court and counsel are without merit. The court energetically exercised its inherent power to assure an orderly trial under difficult trial circumstances occasioned by counsel. The matters complained of are within the discretion of the court and its supervisory powers.

The court below disposed of the complaint of the defendant as to the expert testimony of David Bunin, an actuarial economic consultant, as follows:

"He asserts that since the actuary was not named in plaintiff's answers to interrogatories, defendant was taken by surprise. He also contends that the actuary was improperly permitted to include an inflationary factor in his evaluation of future lost earnings. We find little merit in these contentions, certainly not sufficient to warrant a new trial.

"First the record reveals that after the witness gave certain professional information; defense counsel admitted his qualifications. The witness then stated that plaintiff's work life expectancy was 24 years and based on his past earnings of $220.00 per week without any increased

earning factor, he would be expected to earn $274,560. in the future. The witness having previously explained the meaning of reduction to present worth then testified that the present value of that amount at 6% simple interest would be $166,750.

"It was only after this that the witness referred to growth factor.

"Q. Are there other consideration that come into play when you are talking about earnings?

"A. Yes, because projecting earnings for the future, we have to make allowances for the general rise in earnings in our economic system. For example, in computing the amount of money in a pension plan, as I mentioned before, we have to allow for the fact that in the long run earnings tend to increase based upon various economic factors such as productivity, such as increases in the price level and promotions on the job and longevity and things of this nature which we do know occur on the average over the years, even though earnings can go slightly up or down in any particular year. And so it would be proper in projecting earnings to allow for a reasonable growth factor.

Which the witness stated was 4.19%.

The witness continued, 'the things that would control as to what type of increase to allow for are a number of things.' No where in the witnesses direct testimony was there a question of inflation. This word did not arise until used by defense counsel in cross–examination.

Q. Now, you have given us a growth factor, I seem to have also read something about a factor called inflation.

A. Yes, sir.

Q. We don't know how to control inflation. Do we?

A. No, that's a difficult subject in the United States.

THE COURT: Why are we getting into it.

MR. KRAEMER: Excuse me.

THE COURT: Why are we getting into it? Why are we getting involved in inflation? I'll tell you why I asked, if you will come up here.

After a side bar discussion, defense counsel decided to conclude his cross–examination.

It is clear from the above that the economist only testified to the basis for increased earnings in the future, laid a proper foundation for same and stated the source of his information. Clearly the requirements of *Havens v. Tonner*, 243 Pa.Sup[er]. 271 [371, 365 A.2d 1271] (1976) have been met."

■ Even if we held that the admission was error, it was harmless as the verdict returned by the jury rejected the increase factor and based their verdict on loss of earnings, past and future, medical losses and past and future pain and suffering.

At the time of the trial the plaintiff was 39 years old and the jury had a full opportunity to observe his condition. His life expectancy was 24 years. His doctor testified unequivocally that he suffered from chronic intractable and disabling pain and alcoholism and that such were the results of the shooting in the bar. He testified that his injuries were permanently disabling. He suffered a gunshot wound in the stomach resulting among other things in a splenectomy and post–incisional hernia. He had extreme and chronic pain which led to nervousness, weakness, insomnia and fatigability. He resorted to alcohol to relieve his constant pain. He was unemployable. The alcoholism was the result of his wound and the after effect of constant pain.

■ The jury was justified under the evidence in this case to award substantial damages for pain and suffering, loss of life's pleasures and loss of wages, past and future. See, *Bell v. Yellow Cab Company*, 399 Pa. 332, 160 A.2d 437, 439–440 (1960) in which the Supreme Court expressed extreme skepticism when the trial court gave no reason for ordering a reduction of the verdict and stated 160 A.2d at page 440: "On the basis of plaintiff's injuries and damages, it is not discernable how the court below could conclude that the jury's verdict was excessive."

■ The Constitution of Pennsylvania, Article 3, Paragraph 18 prohibits the General Assembly from limiting the amount of recovery for injuries except for Workmen's Compensation. The courts are not so restricted and may set aside the jury's award if it is so excessive as to shock the court's conscience of sense of justice. *11 P.L.E. Damages § 71, Page 170.*

The court here dismissed all complaints of the defendant in his post–trial motions and asserted that he had a fair trial. There is no statement concerning excessiveness or that the verdict shocked his conscience, only the bare comment "in the interest of justice."

■ The issue of the amount to be awarded an injured person for pain and suffering and loss or impairment of earning power, both past and prospective is primarily a jury question. *James v. Ferguson,* 401 Pa. 92, 162 A.2d 690, 692–93 (1960). It is the duty of the trial court to enforce the jury's verdict and to interfere only "when the circumstances cry for judicial interference." *James v. Ferguson, supra.* We do not believe that this is a case that cries for judicial interference. The order of remittitur brings the verdict below that amount which was proved as plaintiff's loss of earning capacity so that under those circumstances, the verdict as reduced permits no award for medical expenses, past or future suffering, or loss of life's pleasures.

■ A substantial verdict, if supported by the evidence, must be permitted to stand and will not be set aside when there is nothing to suggest that the jury was in any way guided by partiality, prejudice, mistake or corruption. *Dollison v. Baltimore and Ohio Railroad Company,* 446 Pa. 96, 284 A.2d 704 (1971); *Carminati v. Philadelphia Transportation Company,* 405 Pa. 500, 176 A.2d 440 (1962).

The verdict of the jury is supported by the evidence and should stand.

The order of the court below is reversed and the verdict of the jury in the amount of $225,000 is reinstated.

CERCONE, P. J., concurs in the result.