461 A.2d 225

**Samuel FELD and Peggy Feld**

v.

**John W. MERRIAM and Thomas Wynne, Inc., Co-Venturers, T/A Cedarbrook Joint Venture and Globe Security Systems, Inc.**

**Appeal of John W. MERRIAM and Thomas Wynne, Inc., Co-Venturers T/A Cedarbrook Joint Venture.**

Superior Court of Pennsylvania.

Argued June 2, 1982.

Filed May 13, 1983.

Petition for Allowance of Appeal Granted Sept. 2, 1983.

416

Marvin Comisky and William H. Roberts, Philadelphia, for appellants.

Marshall A. Bernstein, Philadelphia, for Feld, appellees.

Joseph R. Livesey, Philadelphia, for Globe, appellee.

Before HESTER, CIRILLO and JOHNSON, JJ.

CIRILLO, Judge:

Appellees, Samuel and Peggy Feld, brought suit against appellant, Cedarbrook Joint Venture (Cedarbrook) to recover for injuries which resulted from a criminal incident that originated in the garage of building number one of the Cedarbrook apartment complex on June 27, 1975. The Felds alleged that Cedarbrook had a duty to provide adequate security for its tenants and that the breach of this duty on the part of Cedarbrook was the proximate cause of their injuries. Following an eight day jury trial, a verdict was rendered in favor of the Felds. Peggy Feld was awarded two million dollars ($2,000,000) in compensatory damages and Samuel Feld was awarded one million dollars ($1,000,000) in compensatory damages. Each of the Felds was also awarded one million, five hundred thousand dollars ($1,500,000) in punitive damages. In addition, damages for delay in the amount of eighty three thousand eight hundred and thirty five dollars and twenty four cents ($83,835.24) were awarded pursuant to Pa.R.C.P. 238. Cedarbrook's post-trial motions for judgment n.o.v., a new trial and remittitur were denied and this appeal followed.

■ In evaluating the trial court's decision to deny a motion for judgment n.o.v., it is fundamental that the evidence must be viewed in the light most favorable to the verdict winners. All conflicts must be resolved in their favor and they must be given the benefit of every reasonable inference arising from the evidence. *Carswell v. S.E. P.T.A.* 259 Pa.Super. 167, 393 A.2d 770 (1978); *Winkler v. Seven Springs Farm, Inc.,* 240 Pa.Super. 641, 359 A.2d 440 (1976).

Cedarbrook apartments is a complex of approximately one thousand units located on a 36 acre tract of land in Cheltenham, Pennsylvania.[1] The grounds can be entered by vehicle through two entrances, each of which was

---

1. Cedarbrook's ownership is legally designated as John W. Merriam and Thomas Wynne, Inc., co-venturers, t/a Cedarbrook Joint Venture. The apartment complex, however, is owned solely by John W. Merriam.

manned by security guards for 16 hours a day in June, 1975.[2] At that time, Samuel and Peggy Feld were tenants in building number one of the Cedarbrook complex. They rented a parking space for their automobile in a garage located beneath that building. This facility had space for 160 cars. Access to the garage could be gained through two entrances, neither of which was equipped with doors. Additionally, the lighting in the garage was poor.

Cedarbrook provided security services for the entire apartment complex pursuant to a contract with Globe Security Services.[3] These services consisted of stationing non-security trained doormen at the entrances to the buildings, and at the two main entrances to the complex. In addition, Globe provided one walking guard who patrolled the entire complex on foot and an additional guard who patrolled the complex in a car at irregular intervals. No regular guard services were provided for the garages.

During the years 1970 to 1975, the crime rate in the Cheltenham area had risen. Additionally, in the three month period preceeding the criminal attack on the Felds, twenty one separate incidents of criminal activity on the Cedarbrook complex were reported to Globe. These incidents included, a robbery, several apartment burglaries, car thefts, and an assault on a tenant in a hallway in one of the buildings.

The Cedarbrook Tenant's Association, as well as individual tenants, complained to the Cedarbrook management about these incidents and requested that additional security be provided. The Tenants Association, Globe, and its predecessor, Diamond Security Services, made specific recommendations to Cedarbrook regarding security measures

**2.** These entrances were not guarded between 9:00 a.m. and 3:00 p.m.

**3.** Globe Security Systems (Globe) was also named as a defendant in the instant action. Globe provided security services for the apartment complex under an oral contract with Cedarbrook. The jury found that Globe had not been negligent for failing to stop the assailants as they entered and left the Cedarbrook grounds, and for failing to discover their presence in the garage. Neither of the parties on the instant appeal have raised any issues with regard to Globe's liability.

that should be taken.[4] These recommendations included: better lighting in the garages and the installation of mechanized doors on the garages which could be opened by use of a key or special card. It would have cost Cedarbrook $20,000 to install these doors. In addition, it was recommended that more guards be provided to patrol the complex, and that these guards be provided with more security training.[5] It was also suggested that the tenants be provided with decals for their cars so that the guards could better screen the cars entering and leaving the complex. Cedarbrook refused to implement any of these measures. It declined to implement the latter because it was concerned that access by the general public to the professional offices, located on the lower floors of the apartment buildings, would be hampered if unmarked cars were screened at the entrances to the complex.

On June 27, 1975, at approximately 9:00 p.m., Samuel and Peggy Feld drove into the Cedarbrook complex through the Limekiln Pike entrance, and parked their car in garage number one. After getting out of the car and locking it, they walked towards the pedestrian exit. Suddenly, three armed men emerged from behind a parked car, accosted them and robbed them at gunpoint. The men then ordered the Felds back into their car, and two of them drove the Felds off the Cedarbrook grounds through the Limekiln Pike exit.[6] The third man followed them in another car.

When the assailants threatened to lock Samuel Feld in the trunk of his car, Peggy Feld, concerned that he would be unable to breath because of his emphysema, told the men that she would do anything they wished if they agreed not

**4.** These complaints and recommendations were made to the manager of Cedarbrook. John W. Merriam bore the ultimate responsibility for determining what security measures were to be provided.

**5.** The guards provided by Globe were paid the minimum wage. Globe would have been able to provide more qualified guards if Cedarbrook had consented to pay a higher hourly wage.

**6.** A security guard was posted at this entrance at the time, but he did not stop the car.

to harm her husband. They assented and, after being raped at gunpoint by one of the men, she succeeded in convincing them to release her husband. Mrs. Feld was raped and sodomized by the men three or four more times before she was finally released.[7]

The Felds testified that they were very upset following the criminal episode and were convinced, during its duration, that they were going to be killed. Mrs. Feld began psychotherapy to help alleviate the severe emotional distress she experienced following the incident. One of Mrs. Feld's psychiatrists testified that after the attack, she had undergone a complete reorganization in personality with major repression. He stated that she would never fully recover from the emotional trauma that she experienced as a result of the events that occurred on the night of June 27, 1975.

Mrs. Feld and members of her family testified that after the criminal incident, she became extremely argumentative, a heavy drinker, and that she developed an inordinate fear of young black men who reminded her of her attackers. She no longer partakes in the many social and community service activities that she once enjoyed, because she is fearful of leaving her home. She is also unable to enjoy the company of her children or her young grandchildren.

Mr. Feld testified that his marriage to Mrs. Feld had been destroyed and that they remained together out of compassion, but not love. He characterized their relationship as one of "brother and sister" rather than husband and wife.

Mr. Feld stated that he was no longer able to sleep at night and that he was constantly in a fearful, nervous and agitated state. He had not received counseling to help him deal with his emotional problems because, at the time of the trial, he was still unable to discuss the details of the criminal episode with anyone, including Mrs. Feld. His family members corroborated his testimony on these points

---

7. The assailants were apprehended and convicted for the crimes perpetrated on the Felds. *See, Commonwealth v. Guess,* 266 Pa.Super. 359, 404 A.2d 1330 (1979).

and described him as a very unhappy man who constantly "barked" at others.

■ Cedarbrook's first contention is that insufficient evidence was presented, with respect to its negligence in designing and operating the security system at the apartment complex, to warrant the submission of this issue to the jury. The questions of whether a landlord owes his tenant a duty to provide security and, if so, what the extent of that duty is, are questions of first impression in this Commonwealth. In other jurisdictions, it has been recognized that a landlord is under a duty to exercise reasonable care to protect his tenants from the forseeable criminal actions of third persons. *See, Kline v. 1500 Massachusetts Avenue Apartment Corp.*, 439 F.2d 477 (D.C.Cir.1970); *O'Hara v. Western Seven Trees Corp.*, 75 Cal.App.3d 798, 142 Cal.Rptr. 487 (1977); *Holley v. Mt. Zion Terrace Apts., Inc.*, 382 So.2d 98 (Fla.App.1980); *Johnson v. Harris*, 387 Mich. 569, 198 N.W.2d 409 (1972); *Trentacost v. Brussel*, 82 N.J. 214, 412 A.2d 436 (1980).

The primary reason for imposing this duty on the landlord is the recent recognition by the courts that, in modern times, a residential lease should not be viewed as a conveyance of land, but rather, as a contract between landlord and tenant, imposing certain rights and duties upon each of them. *See,* 43 A.L.R.3d 331 (1972).

In *Pugh v. Holmes*, 486 Pa. 272, 282, 405 A.2d 897, 902 (1979) (emphasis added), our Supreme Court adopted this characterization of the modern, urban residential lease:

Functionally viewed, the modern apartment dweller is a consumer of housing services. The contemporary leasing of residences envisions one person (landlord) exchanging for periodic payments (rent) a bundle of goods and services, rights and obligations. The now classic description of this economic reality appears in *Javins v. First National Realty Corp.*, 138 U.S.App.D.C. 369, 428 F.2d 1071, 1074, *cert. denied*, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970) (footnote omitted). When American city dwellers both rich and poor, seek shelter today, they seek a well

known package of goods and services—a package which includes not merely walls and ceilings, but also adequate heat, light and ventilation, serviceable plumbing facilities, *secure windows and doors,* proper sanitation and proper *maintenance. Commonwealth v. Monumental Properties, Inc.,* 459 Pa. 450, 467–68, 329 A.2d 812, 820–21 (1974).

This court believes that imposing a duty on the landlord to provide adequate security for his tenants is in keeping with the current trends in landlord-tenant law in this Commonwealth. Therefore, while we do not consider a landlord to be an insurer of his tenants, we hold that in all areas of the leasehold, particularly in the areas under his control, the landlord is under a duty to provide adequate security to protect his tenants from the forseeable criminal actions of third persons.

The duty to exercise reasonable care to protect certain persons from forseeable criminal acts is not new to Pennsylvania Law. This duty has been imposed in the context of carrier-passenger, *see, Kenny v. S.E.P.T.A.,* 581 F.2d 351 (3rd Cir.1978); *Carswell v. S.E.P.T.A.* 259 Pa.Super. 167, 393 A.2d 770 (1978); landowner-invitee, *see, Moran v. Valley Forge Drive-In Theaters,* 431 Pa. 432, 246 A.2d 875 (1968); and inkeeper-guest, *see, Buck v. Hankin,* 217 Pa.Super. 262, 269 A.2d 344 (1970).[8]

Having found that a landlord is under a duty to provide adequate security for his tenants, we must determine the standard of care to which a landlord will be held in the exercise of this duty. Section 302(B) of the Restatement (Second) of Torts (1965) provides a general standard of care that one is obligated to exercise in protecting a person to whom he owes a duty, against the forseeable criminal acts of third parties:

An act or omission may be negligent if the actor realizes or should realize that it involves an unreasonable risk of

---

**8.** The analogy between inkeeper-guest and landlord-tenant is especially persuasive in the instant case. The inn has been described as the only medieval multiple dwelling house. *Kline, supra.*

harm to another through the conduct of the other or a third person which is intended to cause harm, even though such conduct is criminal.

*See, Coath v. Jones,* 277 Pa.Super. 479, 419 A.2d 1249 (1980). This general standard is useful in determining whether a landlord has exercised reasonable care in providing adequate security for his tenants. It is important to note, however, that the conduct of the landlord must be evaluated in light of all the facts of a particular case. Therefore, the custom among landlords of buildings of the same class plays a significant role in determining the reasonableness of a landlord's actions. *See, e.g. Kline,* 439 F.2d at 486.[9] In addition, a landlord may be held to the same standard of care that he employed upon the commencement of the lease. *See, Kline, supra; Ramsay v. Morrissette,* 252 A.2d 509 (D.C.App.1969); *Holley v. Mt. Zion Terrace Apartments, Inc.,* 382 So.2d 98 (Fla.App. 1980). Therefore, in order to establish a prima facie case of negligence against a landlord for his failure to provide adequate security, a plaintiff must present evidence showing that the landlord had notice of criminal activity which posed risk of harm to his tenants, that he had the means to take precautions to protect the tenant against this risk of harm, and that his failure to do so was the proximate cause of the tenant's injuries.

In determining whether the Felds presented sufficient evidence to establish a prima facie case of negligence against Cedarbrook, we note that,

9. It is important to note that this is just one factor to be considered in evaluating the reasonableness of the landlord's conduct. As the Supreme Court of Pennsylvania, quoting Mr. Justice Holmes, pointed out, "What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it is usually complied with or not." *Hudson v. Grace,* 348 Pa. 175, 181, 34 A.2d 498, 502 (1943). *See also, Incollingo v. Ewing,* 444 Pa. 263, 282 A.2d 206 (1971). Therefore, if a landlord does not provide locks for the doors in a building located in a high crime district, his conduct may be unreasonable despite the fact that no other landlord in the area provides such locks. At the same time, a landlord may be found to have acted reasonably in refusing to provide a 24 hour a day doorman for a townhouse which has been converted to walk-up apartments.

[T]he jury may not be permitted to reach its verdict merely on the basis of speculation or conjecture, ... there must be evidence upon which logically its conclusion may be based .... Clearly this does not mean that the jury may not draw inferences based upon all the evidence and the juror's own knowledge or experiences, for that is, of course, the very heart of the jury's function. It means only that the evidence presented must be such that by reasoning from it, without resort to prejudice or guess, a jury can reach the conclusions sought by the plaintiff, and not that that conclusion must be the *only* one which can logically be reached.

It is not necessary under Pennsylvania law that every fact or circumstance point unerringly to liability; it is enough that there be sufficient facts for the jury to say reasonably that the preponderance favors liability.

*Smith v. Bell Telephone Company of Pennsylvania*, 397 Pa. 134, 138, 153 A.2d 477, 479–480 (1959) (citations omitted), (emphasis in original). *See, also, Eldridge v. Melcher*, 226 Pa.Super. 381, 313 A.2d 750 (1973).

▮ Cedarbrook contends that since it did not have prior notice of sexual assaults occurring on the Cedarbrook grounds, that it cannot be held liable under the facts of the instant case. We disagree. Restatement (Second) of Torts, § 281, Comment J (1965) provides: [10]

[T]he fact that the interest to which harm results is a different interest, or a different kind of interest than that which was threatened with harm, will not prevent the actor from being liable, so long as the interest in fact harmed is one entitled to legal protection against negligence. .

*See, Morgan v. Bucks Associates*, 428 F.Supp. 546, 551 (E.D.Pa.1977). *See, also Ford v. Jeffries*, 474 Pa. 588, 379 A.2d 111 (1977). In the instant case, sufficient evidence was presented to show that Cedarbrook was aware of criminal activity on the Cedarbrook grounds. From this

**10.** Section 281 of the Restatement (Second) of Torts (1965) sets forth the elements for a cause of action in negligence.

evidence, the jury could have concluded that Cedarbrook had sufficient notice that criminal conduct by third parties was likely to endanger the safety of its tenants.

█ Cedarbrook also contends that there was insufficient evidence for the jury to hold it liable because the criminal conduct of which it had notice did not occur in garage number one. We disagree. Once it was shown that Cedarbrook had notice of criminal activity, it was a question of fact for the jury as to whether or not Cedarbrook fulfilled its duty to protect its tenants from criminal acts. *Moran*, 431 Pa. at 437–39, 246 A.2d at 879. The exact location of the prior criminal acts was immaterial as far as Cedarbrook's duty was concerned. *See, Murphy v. Penn Fruit Co.*, 274 Pa.Super. 427, 418 A.2d 480 (1980). Sufficient evidence was presented upon which the jury could conclude that the criminal attack on the Felds was reasonably forseeable.

█ Cedarbrook also asserts that insufficient evidence was presented regarding security measures taken at other apartment complexes of the same class as Cedarbrook. We disagree. Two experts testified that the security provided by Cedarbrook did not conform to the accepted standard in buildings of the same class in June of 1975. From this evidence the jury could have logically concluded that Cedarbrook acted unreasonably in failing to implement a more effective security plan. Therefore, we find that the lower court properly refused to grant Cedarbrook's motion for judgment n.o.v. on the issue of whether it was negligent in failing to provide adequate security.[11]

11. Additionally, Cedarbrook contends that there was insufficient evidence that its negligence was the proximate cause of the Feld's injuries, in light of the fact that the jury absolved Globe of liability. We disagree. In the instant case, the jury was presented with conflicting evidence on the question of whether Cedarbrook's failure to provide adequate security or Globe's failure to prevent the criminal assault, was the proximate cause of the Feld's injuries. Therefore, the issue was properly submitted to the jury. *See, Ross v. Vereb*, 481 Pa. 446, 392 A.2d 1376 (1978); *Kuzmics v. Santiago*, 256 Pa.Super. 35, 389 A.2d 587 (1978). From the evidence, the jury could have logically concluded that Globe's failure to discover the criminal act was due to

■ Cedarbrook's next contention is that the amount of compensatory damages awarded in the instant case was excessive. We disagree with this assertion. In reaching this conclusion, we begin with the observation that "in any effort to translate such ... loss ... into money damages ..., systematic logic is not helpful and precision is not achievable." *Frankel v. Heym*, 466 F.2d 1226, 1228 (3rd Cir.1972); *See, also, Robert v. Chodoff*, 259 Pa.Super. 332, 393 A.2d 853 (1978). It is well established that the amount of damages to which a person is entitled for past and future pain and suffering is primarily a jury question. *James v. Ferguson*, 401 Pa. 92, 162 A.2d 690 (1960). A substantial verdict, if supported by the evidence, will be permitted to stand if there is nothing to suggest that the jury was in any way guided by partiality, prejudice, mistake or corruption. *Tonik v. Apex Garages*, 442 Pa. 373, 275 A.2d 296 (1971); *Prather v. H–K Corp.*, 282 Pa.Super. 556, 423 A.2d 385 (1980). In determining whether a jury's award of compensatory damages is excessive, the following factors are considered:

1.) the severity of the injury;

2.) whether the injury is supported by objective physical evidence or only by subjective evidence;

3.) whether the injury is permanent;

4.) the plaintiff's ability to continue his employment;

5.) the disparity between the amount of out-of-pocket expenses and the amount of the verdict; and

6.) the damages a plaintiff requested in his complaint. *Fretts v. Pavetti*, 282 Pa.Super. 166, 422 A.2d 881 (1980); *Kemp v. Philadelphia Transportation Co.*, 239 Pa.Super. 379, 361 A.2d 362 (1976).

■ The evidence presented at the trial amply supports the jury's finding that the injuries sustained by Samuel and Peggy Feld were severe. We disagree with Cedarbrook's assertion that the verdicts in the instant case were

Cedarbrook's failure to provide enough guards to patrol the complex, and Cedarbrook's refusal to institute a screening system at the entrances to the complex.

not supported by the evidence because the Felds' only presented subjective evidence of their injuries. In a personal injury action, it is totally within the jury's province to disbelieve or believe all or part of the testimony of any witness and to arrive at a verdict of damages which they determine will compensate a plaintiff for his loss. *Rodgers v. Hammett,* 229 Pa.Super. 6, 323 A.2d 394 (1974). In the instant case, the Feld's testimony regarding the severity of their injuries was corroborated by both lay and expert witnesses. Additionally, Mrs. Feld suffered a severe weight loss following the criminal incident which was attributed to her severely depressed emotional state. The lower court fully instructed the jury on the legal rules regarding credibility. We will not disturb the verdicts merely because the jury chose to believe the testimony of the Felds' and their witnesses. *Stoughton v. Kinzey,* 299 Pa.Super. 499, 445 A.2d 1240 (1982). The evidence supported the jury's finding that the injuries suffered by Mrs. Feld are permanent. Expert witnesses for both Cedarbrook and the Felds testified to this effect. The evidence also supports the jury's conclusion that the Feld marriage will never return to its former, happy state.[12] *See, Baccare v. Mennella,* 246 Pa.Super. 53, 369 A.2d 806 (1976); *Fretts v. Pavetti,* 282 Pa.Super. 166, 422 A.2d 881 (1980).

Moreover, we disagree with Cedarbrook's contention that the verdicts in the instant case were excessive because neither Peggy nor Samuel Feld presented evidence showing that they were unable to continue their employment. This consideration is not relevant in the instant case because the Felds did not seek damages for lost wages and the jury was not instructed to consider them in arriving at a

12. We disagree with Cedarbrook's contention that Samuel Feld is precluded from recovering compensatory damages because he did not mitigate damages by undergoing professional counseling. Where a plaintiff's general rejection of psychiatric treatment is a manifestation of his emotional injuries, as in the instant case, he is not precluded from recovering damages. *See, Browning v. United States,* 361 F.Supp. 17 (E.D.Pa.1973).

damage figure. *See, Stoughton v. Kinzey,* 299 Pa.Super. 499, 445 A.2d 1240 (1982), *compare, Lambert v. PBI Industries,* 244 Pa.Super. 118, 366 A.2d 944 (1976). We also disagree with Cedarbrook's assertion that the disparity between the out-of-pocket expenses and the amount of the verdicts compels the conclusion that the verdicts were excessive.[13] As stated by Justice Musmanno in *Carminati v. Philadelphia Transportation Co.,* 405 Pa. 500, 507–508, 176 A.2d 440, 444 (1962), "[T]o prove excessiveness by making a comparison between the medical expense incurred and the amount of the verdict ... may be as unreliable as an elastic ruler." It is well established that there is no legal requirement that an award for pain and suffering bear any particular relationship to the special damages incurred. *Murphy, supra; Simmons v. Mullen,* 231 Pa.Super. 199, 331 A.2d 892 (1974). *See, also, Moran,* supra; *Fretts, supra.*

█ Additionally, we reject Cedarbrook's assertion that the Felds are not entitled to the verdicts they were awarded in light of the fact that they only requested damages in excess of $10,000. Pa.R.C.P. 1044(b) provides, in pertinent part,

> Any pleading demanding relief for unliquidated damages shall without claiming any specific sum, set forth only whether the amount is in excess, or not in excess of $10,000.

Under this rule, the Felds were prohibited from demanding a specific amount of damages and could only request relief in excess of $10,000, which they did.

We find, therefore, that the compensatory damages awarded to Samuel and Peggy Feld, while substantial, were not excessive. In addition, there is no support in the record to support Cedarbrook's assertion that the jury awarded

13. Peggy Feld incurred out-of-pocket expenses of $8,900, for 179 hours of psychiatric counseling at $50.00 per hour. Samuel Feld incurred no out-of-pocket expenses.

compensatory damages out of passion or prejudice.[14] Therefore, the lower court correctly denied Cedarbrook's motions for a new trial and for remittitur.

Cedarbrook also contends that there was not sufficient evidence of "outrageous conduct" on its part to submit the issue of its liability for punitive damages to the jury.

Pennsylvania has adopted the rule of punitive damages as set forth in the Restatement of Torts, section 908 (1939).[15] *Chambers v. Montgomery,* 411 Pa. 339, 192 A.2d 355 (1963); *Focht v. Rabada,* 217 Pa.Super. 35, 268 A.2d 157 (1970). Section 908(1) provides: "Punitive damages are damages other than compensatory or nominal damages awarded against a person to punish him for his outrageous conduct." Punitive damages are awarded only for outrageous conduct which is defined as acts done with a bad motive or with reckless indifference to the interests of others. *Focht v. Rabada, supra. See,* Restatement (Second) Torts, section 908(2) and comment (b) (1965). As our Court pointed out in *Focht v. Rabada,* 217 Pa.Super. 35, at 39, 268 A.2d 157, at 159 (1970), "Some direction in determining the nature of a 'reckless' act may be obtained by reference to section 500 of the Restatement of Torts titled Reckless Disregard of Safety (Defined)." Restatement of Torts, Section 500 (1939) [16] provides:

14. Cedarbrook also places great emphasis on the fact that smaller verdicts have been awarded in other personal injury actions. We find this argument unpersuasive. "[S]uch a comparative approach is only of limited usefulness. Each case must be evaluated on its merits within the framework of its distinctive facts." *Weaver v. Ford Motor Co.,* 382 F.Supp. 1068, 1076 (E.D.Pa.1974).

15. Restatement (Second) Torts section 908 (1967) is in all material parts identical to the Restatement of Torts, section 908 (1939).

16. Restatement (Second) Torts, section 500 (1967) is in all material parts identical to the Restatement of Torts, section 500 (1939). The Reporter to the Second Restatement stated: "This Section has been changed from the first Restatement by rewording it in the interest of clarity. No change in substance is intended." Restatement (Second) Torts section 500 (Appendix). In the instant case the trial court correctly charged the jury in accordance with the first Restatement

The actor's conduct is in reckless disregard of the safety of another if he intentionally does an act or fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize that the actor's conduct not only creates an unreasonable risk of bodily harm to the other but also involves a high degree of probability that substantial harm will result to him.

Sufficient evidence was presented to establish each element of section 500. Sufficient evidence was presented to establish that Cedarbrook intentionally failed to do an act which it was its duty to another to do: that is, Cedarbrook intentionally failed to provide adequate security for its tenants. The jury could find this element of intent from the evidence presented of Cedarbrook's knowledge of the increasing incidence of crime in the Cheltenham area and in the Cedarbrook complex itself, and Cedarbrook's refusal in the face of this increased criminal activity to implement the security measures recommended by Diamond Security Services, Globe Security and the Tenants Association. The jury could find from the evidence that Cedarbrook's refusal to implement these increased security measures was the result of a conscious business decision.

Sufficient evidence was also presented to establish that Cedarbrook knew or had reason to know of facts which would lead a reasonable man to realize its conduct in failing to provide adequate security not only created an unreasonable risk of bodily injury to its tenants but also involved a high degree of probability that substantial harm would result to them. As we have already pointed out, evidence was presented that Cedarbrook had knowledge of the increasing incidence of criminal activity in the Cheltenham area and in the Cedarbrook complex itself. Furthermore, evidence was also presented that in the three month period preceding the attack on the Felds, twenty-one incidents of criminal activity in the Cedarbrook complex were reported

and use of the Restatement Second would in no way effect this decision.

to Globe. Two of these incidents involved crimes of violence: an assault, in which a woman was thrown to the floor and a strong arm robbery.

Knowledge of the increasing incidence of crime, including crimes of violence, in the Cedarbrook complex and the surrounding area, would lead a reasonable man to realize that Cedarbrook's failure to provide adequate security created an unreasonable risk of bodily injury to its tenants and also involved a high degree of probability that substantial harm would result to them.

Finally we note that Restatement of Torts section 500, comment (d) (1939) provides: "If the actor's conduct is such as to involve a high degree of chance that serious harm will result from it to anyone who is within the range of its effects, the fact that he knows or has reason to know that others are within such range is conclusive of the recklessness of his conduct towards them." *See also, Focht v. Rabada,* 217 Pa.Super. 35, 39, 268 A.2d 157, 159 (1970). As has already been pointed out, the evidence was sufficient to support a finding by the jury that Cedarbrook's intentional failure to provide adequate security involved a high degree of chance that serious harm would result to its tenants and Cedarbrook can clearly be charged with the knowledge that its tenants were within the range of that risk.

In sum, there was sufficient evidence of outrageous conduct on Cedarbrook's part to submit the issue of its liability for punitive damages to the jury.

Cedarbrook also contends that the punitive damages awarded to Samuel and Peggy Feld in the instant case were excessive. We find that the award of $1,500,000 in punitive damages to Samuel Feld is not supported by the evidence and, therefore, modify the verdict rendered in his favor.

 The purpose of punitive damages is to punish the wrongdoer for his outrageous conduct and to deter him and others from engaging in similar conduct in the future. *Esmond v. Liscio,* 209 Pa.Super. 200, 224 A.2d 793 (1966). In cases where an award of punitive damages is proper, the

decisions of whether to award them and the amount to be awarded are within the discretion of the jury. *See, Focht v. Rabada, supra; Restatement Torts*, § 908(2) (1939). In determining the amount of punitive damages to be awarded, the jury must consider the tortious act itself, the relationship between the parties, and all other attendant circumstances, including the motives of the wrongdoer. *Thomas v. American Cystoscope Makers, Inc.*, 414 F.Supp. 255 (E.D.Pa.1976); *Hughes v. Babcock*, 349 Pa. 475, 37 A.2d 551 (1944). An award of punitive damages will only be reduced on appeal if the reviewing court determines that it is excessive under the facts of the individual case. *International Electronics Co. v. N.S.T. Metal Products Co.*, 370 Pa. 213, 88 A.2d 40 (1952).

■■■■■■ Punitive damages are considered to be excessive when they are so large as to indicate that the jury was influenced by passion or prejudice; when they do not bear a reasonable relation to the injury or the cause of it; or when they are disproportionate to the amount of compensatory damages awarded. *See, Givens v. W.J. Gilmore Drug Co.*, 337 Pa. 278, 10 A.2d 12 (1940); *Thompson v. Swank*, 317 Pa. 158, 176 A. 211 (1934); *Mitchell v. Randal*, 288 Pa. 518, 137 A. 171 (1927), *Contra, Rhoads v. Heberling*, 306 Pa.Super. 35, 451 A.2d 1378 (1982). Punitive damages cannot be measured by a yardstick. They are not considered to be disproportionate to compensatory damages unless they are greatly in excess of compensatory damages. *See, Givens, Thompson, Mitchell, supra.*

■■■■ Applying these standards to the facts of the instant case, we find that the award of $1,500,000 in punitive damages to Peggy Feld was adequately supported by the evidence. This award bears a reasonable relation to the injuries she sustained and is not disproportionate to the $2,000,000 in compensatory damages which she was awarded. Additionally, there is no support in the record for Cedarbrook's contention that she was awarded such a large amount of punitive damages due to passion or prejudice on the part of the jury.

438

■ We note, however, that Samuel Feld's injuries were less severe than Peggy Feld's, that he received $1,000,000 less in compensatory damages than she did, and yet, was awarded the same amount of punitive damages. This leads us to conclude that his punitive damage award does not bear a reasonable relation to the injuries he sustained. Therefore, we reduce Samuel Feld's punitive damage award to $750,000 so that the damages awarded to him bear the same relationship of compensatory to punitive damages as do the damages awarded to Peggy Feld.

Cedarbrook also contends that it is entitled to a new trial due to the trial court's refusal to grant its motion for separate trials on the issues of liability and punitive damages. Cedarbrook avers that this alleged error was compounded when the trial court admitted into evidence the fact that John W. Merriam, the principal of Cedarbrook, was worth forty million dollars ($40,000,000).

■ We reject these contentions. A new trial will not be granted absent a palpable abuse of discretion which clearly influenced the outcome of the case. *Phelps v. Paul L. Britton, Inc.*, 412 Pa. 55, 192 A.2d 689 (1963). Additionally, the decision of whether or not to grant separate trials lies within the discretion of the trial court. Separate trials should not be allowed where prejudice is not likely to result from a joint trial, Pa.R.C.P. 213(b). *See also, Swanger v. Pyles*, 204 Pa.Super. 72, 203 A.2d 488 (1964).

■ It is well established that evidence of a defendant's net worth is admissible in cases where punitive damages are sought. *Thomas v. American Cystoscope Makers, Inc.*, 414 F.Supp. 255 (E.D.Pa.1976); *Aland v. Pyle*, 263 Pa. 254, 106 A. 349 (1919); Restatement of Torts, section 908(2) (1939). Such evidence, however, should not be admitted until a plaintiff has presented a prima facie case on the issue of a defendant's outrageous behavior. *Givens v. W.J. Gilmore*, 337 Pa. 278, 10 A.2d 12 (1940). Additionally, the reception of such evidence should be carefully safeguarded by the court to prevent injustice to the defendant. *Ayre v.*

*Dickstein,* 337 Pa. 471, 12 A.2d 19 (1940). All of these procedures were followed by the court below in the instant case. *See,* Pa.R.C.P. 224.[17] Moreover, in its charge to the jury, the lower court cautioned:

> This evidence, members of the jury, of the net worth of $40 million dollars is to be used by you as an aid or as a guide to determine the amount of damages which will serve the punishment purposes. It is not to be used by you as a method of inflaming your patience (sic), or prejudice, against this defendant because he happens to be a wealthy or prosperous person.

In view of the precautions taken and the instructions given, we fail to discern how Cedarbrook was prejudiced by the trial court's refusal to grant its motion for separate trials. Therefore, it is not entitled to a new trial on that basis.

Cedarbrook also contends that the lower court erred in refusing to allow it to introduce evidence of a net tax loss resulting from the operation of the Cedarbrook Apartment Complex. On direct examination, John W. Merriam, the owner of the complex, testified as to the amount Cedarbrook spent on security and Cedarbrook's annual income from apartment rentals. Another witness for Cedarbrook testified, on direct examination, as to what Cedarbrook's annual apartment rental income would have been with 100% occupancy.[18] These questions were asked in order to determine the feasibility of spending more money to provide

**17.** Pa.R.C.P. 224 provides:

Regulation of Order of Proof

The Court may compel the plaintiff in any action to produce all his evidence on the question of the defendant's liability before he calls any witness to testify solely to the extent of the injury or damages. The defendant's attorney may then move for a non-suit. If the motion is refused, the trial shall proceed.

This practice has been recommended as a means of protecting against the danger that a jury will base its award of compensatory damages on the wealth of a defendant. See, V. Levit, Punitive Damages: Yesterday, Today and Tomorrow, 1980 *Ins.L.J.* 257, 261–61 (1980).

**18.** These figures included income from apartment rentals alone and did not include income from the other commercial enterprises located in the Cedarbrook Hills Apartment Complex. The annual rental income was between four and five million dollars.

additional security services. *See, Hyndman v. Pennsylvania Railroad*, 396 Pa. 190, 152 A.2d 251 (1959); *Bethay v. Philadelphia Housing Authority*, 271 Pa.Super. 366, 413 A.2d 710 (1979). Cedarbrook then sought to introduce evidence that in the years 1970 through 1975, it had sustained a net tax loss in the operation of the apartment complex. The trial court refused to admit this evidence on the ground that it would have introduced collateral matters into the trial which were not relevant to the immediate issues.

It is well established that it is the trial court's function to exclude evidence that would confuse the jury and divert their attention from the primary issues in a case. *Eldridge v. Melcher*, 226 Pa.Super. 381, 313 A.2d 750 (1973): *Geesey v. Albee Pennsylvania Homes*, 211 Pa.Super. 215, 235 A.2d 176 (1967). Questions concerning the admission or exclusion of evidence are within the sound discretion of the trial court and will not be disturbed absent a clear indication that that discretion has been abused. *Catina v. Maree*, 272 Pa.Super. 247, 415 A.2d 413 (1979). Had Cedarbrook's proffered evidence been admitted, the jury might have been led to believe that Cedarbrook had not made a profit for five years. Additionally, appellees would have attempted to offer evidence regarding tax shelters to dispel this notion. This would clearly have diverted the jury's attention from the issue of whether Cedarbrook had the financial means to provide better security services. Therefore, we cannot say that the trial court abused its discretion when it refused to allow Cedarbrook to introduce evidence of its net tax loss.

Cedarbrook's final contention is that Pa.R.C.P. 238, under which delay damages were awarded, is unconstitutional.[19] This argument was neither raised in, nor con-

19. Pa.R.C.P. 238 provides, in pertinent part:
 Rule 238. Award of Damages for Delay in an Action for Bodily Injury, Death or Property Damage
 (a) Except as provided in subdivision (e), in an action seeking monetary relief for bodily injury, death or property damage, or any combination thereof, the court or the arbitrators appointed under the Arbitration Act of June 16, 1836, P.L. 715, as amended, 5 P.S.

sidered by, the court below. Therefore, the issue has been waived and will not be considered by this court on appeal. Pa.R.A.P. 302(a); *Robert F. Felte, Inc. v. White*, 451 Pa. 137, 302 A.2d 347 (1973); *Scuro v. Scuro*, 226 Pa.Super. 592, 323 A.2d 49 (1974).

Order affirmed as modified.

§ 30 et seq., or the Health Care Services Malpractice Act of October 15, 1975, P.L. 390, 40 P.S. § 1301.101 et seq., shall

(1) add to the amount of compensatory damages in the award of the arbitrators, in the verdict of a jury, or in the court's decision in a nonjury trial, damages for delay at ten (10) percent per annum, not compounded, which shall become part of the award, verdict or decision;

(2) compute the damages for delay from the date the plaintiff filed the initial complaint in the action or from a date one year after the accrual of the cause of action, whichever is later, up to the date of the award, verdict or decision.

. . . .

(c) Except as provided in subdivision (e), damages for delay shall be added to the award, verdict or decision against all defendants found liable, no matter when joined in the action.

(d) The court may, and on request of a party shall, charge the jury that if it finds for the plaintiff, it shall not award the plaintiff any damages for delay because this is a matter for the court.

(e) If a defendant at any time prior to trial makes a written offer of settlement in a specified sum with prompt cash payment to the plaintiff, and continues that offer in effect until commencement of trial, but the offer is not accepted and the plaintiff does not recover by award, verdict or decision, exclusive of damages for delay, more than 125 percent of the offer, the court or the arbitrators shall not award damages for delay for the period after the date the offer was made.

(f) If an action is pending on the effective date of this rule, or if an action is brought after the effective date on a cause of action which accrued prior to the effective date, damages for delay shall be computed from the date plaintiff files the initial complaint or from a date one year after the accrual of the cause of action, or from a date six (6) months after the effective date of this rule, whichever date is later.