# National Grange Mutual Fire Insurance Company v. Walsh

*C. Scott Rybny,* for plaintiff.

*Joseph G. Ferguson* and *David F. Chuff,* for defendants.

MINORA, J., December 29, 2005—

## I. INTRODUCTION

Currently before the court are two matters which we will dispose of in this consolidated memorandum and order. The first is the plaintiff's preliminary objections to defendants' amended answer, new matter and counterclaim. The second is plaintiff's motion to sever and stay defendants' counterclaim. Both of these filings took place on May 27, 2004.

Other unrelated discovery issues wound their way through our appellate courts. Eventually, the record was returned to the trial court, allowing us to be in a position to resolve the outstanding preliminary objections and motion to sever and stay mentioned above.

Looking at the facts in the light most favorable to the non-moving party reveals that this case arises out of an incident that occurred on or about December 8, 2002, at a rental property owned by Conrad and Cyndi Walsh. The property is a two-story residential property located at 728 Alder Street in Scranton, Pennsylvania. Both Mr. and Mrs.

Walsh are lifelong residents of the Scranton/Wilkes-Barre area who now reside in Avoca, Pennsylvania. Mr. Walsh originally grew up in the home and later purchased the property from his parents. Mr. and Mrs. Walsh lived in the first floor apartment after they were married in 1993 until they moved to their present location in Avoca, Pennsylvania. After moving out of the first floor apartment, the Walshes rented the first floor until September 1999. The second floor apartment remained unoccupied while Mr. Walsh renovated the second floor apartment.

On or about December 8, 2002, a water pipe froze and broke on the second floor of the property causing significant damages to the premises. The heating system for the premises is a gas fired hot water boiler system. The property was unoccupied at the time of the incident, although the first floor apartment was ready for occupation and had a "For Rent" sign in the window. The second floor apartment was not ready to be rented at the time of the incident because Mr. Walsh was in the process of renovating it.

Prior to the incident, on Sunday, December 1, 2002, Mr. Walsh had visited the property to check on the premises and to turn the heat up in the building. On Wednesday, December 4, 2002, Mr. Walsh again visited the premises to check the water level in the boiler. Mr. Walsh discovered that the boiler had not used any water and that the pilot light was not lit. Immediately, Mr. Walsh contacted a plumber to have the boiler inspected and repaired. He arranged to meet the plumber the next day, December 5, 2002.

Unfortunately, the area was hit with a major snowstorm on that Thursday and the plumber postponed the appointment to the next day, Friday, December 6, 2002.

The plumber again cancelled his appointment for the next day because his wife had a baby. Mr. Walsh tried calling other plumbers to inspect the boiler, but all he contacted were too busy to meet with him.

On Monday, December 9, 2002, before he could get the boiler inspected, Mr. Walsh received a telephone message from a Mr. Fisher, who lives next door to the rental property, indicating that water was leaking into Mr. Fisher's home and seemed to be coming from Mr. Walsh's rental property. Mr. Walsh immediately went to the premises to inspect the property and discovered extensive water damages throughout the premises caused by the broken pipe. Mr. Walsh shut off the water supply, but could do no more because it was late and dark and he was afraid to use anything electrical because of all the standing water. He again called his plumber and arranged to meet the plumber at the premises the next day.

On Tuesday, December 10, 2002, Mr. Walsh met with the plumber at the premises. The plumber inspected the boiler and determined that there was no gas service coming in from the main gas line in the street. That same day, Mr. Walsh called National Grange to report the loss. Mr. Walsh was advised that someone from National Grange would be in touch with him the next day.

On December 11, 2002, Mr. Walsh returned to the premises to clean up the water damage and to try to dry out the property. When he arrived there, he discovered a tag from PG Energy hanging on the front door handle (dated December 11, 2002, tag no. 52 0546) with a handwritten message indicting "check RDG on the inside meter." Mr. Walsh tried calling PG Energy when he returned home, but the offices were closed.

The next day, December 12, 2002, Mr. Walsh called PG Energy and spoke with a Mr. Warner who indicated that PG Energy was concerned because Mr. Walsh's gas usage seemed to be down. Mr. Walsh then informed Mr. Warner that he had no gas service and told Mr. Warner about the damage to his property. He also requested that gas service be restored to the premises immediately. Mr. Warner then told Mr. Walsh that PG Energy disconnected the gas to his property sometime in October 2002, along with several other properties on the same block of Alder Street, in order to change the meters on the houses from indoor meters to outdoor meters.

From October 2002, through and including December 2002, Mr. Walsh continued to receive bills from PG Energy for gas service to the premises, which were sent to his Avoca residence address. All bills were timely paid in full. From October 2002 to December 12, 2002, PG Energy never notified the Walshes that the gas service to the Alder Street property had been disconnected.

On December 12, 2002, a representative of PG Energy restored gas service to the property. On that same day, Mr. Walsh had the heating system inspected by the plumber who determined that the boiler was in good working condition.

In the meantime, Mr. Walsh still had not received a response to his December 10, 2002 telephone call to National Grange to report the loss. Having not heard from his insurance company for over a month, Mr. Walsh secured legal counsel to try to get National Grange to respond to his claim. By letter dated January 21, 2003, Mr. Walsh's counsel wrote to Thomas M. VanBerkel, President of National Grange, requesting that someone attend

to Mr. Walsh's claim. National Grange responded by letter dated January 28, 2003, indicating that coverage was not being afforded under the policy. However, no one from National Grange had previously communicated that fact to Mr. and Mrs. Walsh. Later, a "Naomi" from National Grange's Adjuster Center called Mr. Walsh to assure him that his loss *would* be covered and that he would be hearing from an adjuster very soon.

Mr. Walsh finally did meet with National Grange's adjuster on February 4, 2003, almost two months after the incident. Instead of adjusting the loss, National Grange made the Walshes submit to oral examinations.

National Grange ultimately chose not to cover the Walsh's loss and instead chose to sue its insureds by filing the instant declaratory judgment complaint. The defendants filed an answer, new matter and counterclaim, which included counts for declaratory judgment, breach of contract and statutory bad faith. National Grange filed preliminary objections claiming, inter alia, that defendants' answer was untimely and that the defendants could not seek attorneys' fees under a breach of contract claim. Defendants filed an amended answer, new matter and counterclaim removing their request for attorneys' fees with respect to their breach of contract claim. National Grange again filed these current preliminary objections seeking to strike defendants' new matter and counterclaims as untimely as well as raising a demurrer against defendants' breach of contract and bad faith claims.

In addition to the preliminary objections to defendants' amended answer, new matter and counterclaim, the plaintiff filed a motion to sever and stay defendants' counter-

claims for breach of contract and bad faith until the declaratory judgment issues are resolved.

All of these issues were argued before the undersigned on November 9, 2004.

At that time, the undersigned indicated at argument court that the issue of timeliness was a non-issue as the court always stresses substance over form and that we would determine the remaining preliminary objections on the merits of the pleadings as National Grange could not demonstrate any prejudice by defendant's alleged untimely filing. Moreover, it is in our discretion to do so. See *Peters Creek Sanitary Authority v. Welch,* 545 Pa. 309, 681 A.2d 167 (1996).

The remaining preliminary objections and motion to stay and sever have been thoroughly briefed, though their disposition was delayed by the official court record being in our appellate court system on those aforementioned unrelated discovery issues.

With the file having been returned to the trial court, the record is now ripe for the disposition of the outstanding preliminary objection issues and motion to stay and sever issues, which we will address below.

## II. ISSUES

(A) Should plaintiff's demurrer to defendants' counterclaim for breach of contract be granted or overruled?

(B) Should plaintiff's demurrer to defendants' counterclaim for statutory bad faith be granted or overruled?

(C) Should plaintiff's motion to sever and stay defendants' counterclaims until plaintiff's declaratory judgment action is resolved be granted or denied?

## III. DISCUSSION

### *The General Standards for a Demurrer Under Pa.R.C.P. 1028(a)(4)*

In reviewing preliminary objections in the nature of a demurrer, a court must accept as true all well-pleaded facts that are material and relevant, as well as any reasonable inferences deducible therefrom. *Commonwealth v. Percudani,* 825 A.2d 743, 745 (Pa. Commw. 2003); *Werner v. Plater-Zyberk,* 799 A.2d 776 (Pa. Super. 2002), *appeal denied,* 569 Pa. 722, 806 A.2d 862 (2002).

The question presented on demurrer is whether, on the facts averred, the law says with certainty that no recovery is possible. *Werner v. Plater-Zyberk, supra.* Moreover, preliminary objections in the nature of a demurrer which would dismiss a cause of action should only be granted where the case is clear and free from doubt. *Werner v. Plater-Zyberk, supra.*

Finally, any doubt at all must be resolved by refusing to grant the demurrer. *Werner v. Plater-Zyberk, supra.*

With those principles in mind, we can now examine the plaintiff's specific grounds for a demurrer.

### A. Should Plaintiff's Demurrer to Defendants' Counterclaim for Breach of Contract Be Granted or Overruled?

Plaintiff's demurrer to defendants' counterclaim for breach of contract is misguided. The plaintiff seems to argue that because they filed a declaratory judgment action against their insureds that this, in and of itself, would

not support a breach of contract action by the insureds against its insurer. (See an unreported decision *Allstate Insurance Company v. Kenney,* 2003 WL 22345683 (E.D. Pa. 2003).)

However, defendants base their breach of contract claims not solely on the plaintiff filing a declaratory judgment action against its insureds, but on their entire course of conduct in handling its contractual duties.

First, we note that to establish a cause of action for breach of contract, the counterclaim plaintiff must show:

"(1) the existence of a contract, including its essential terms;

"(2) a breach of duty imposed by the contract; and

"(3) damages as a result of the breach." *Williams v. Nationwide Mutual Insurance Company,* 750 A.2d 881, 884 (Pa. Super. 2000).

In the case at hand, defendants have clearly pled the existence of the Dwelling Insurance Policy at issue and its essential terms which obligated the plaintiff to cover the subject losses. They clearly pled their losses and the duty of the plaintiff to cover said losses. Moreover, they clearly pled the property damage and monetary losses caused by plaintiff's refusal to cover said losses. (See defendants' answer, new matter and counterclaim paragraphs 111-118 and paragraph 120.)

Therefore, since we must accept defendants' well pleaded facts as true (see *Commonwealth v. Percudani, supra)* and defendants' counterclaim sets forth the essential elements of a breach of contract action, plaintiff's

demurrer to Count II (breach of contract) of defendants' counterclaim will be overruled, dismissed and denied.

### B. Should Plaintiff's Demurrer to Defendants' Counterclaim for Statutory Bad Faith Be Granted or Overruled?

Again, the defendants do not base their Count III bad faith claim solely or merely on plaintiff's decision to file a declaratory judgment action against its insureds.

Defendants' bad faith claim is also based upon the plaintiff's failure and refusal to cooperate with its insured, its failure to return telephone calls and inquiries, its failure and refusal to send an adjuster to inspect the property in a timely manner, and its failure to respond to their insureds without intervention of counsel even though one of its representatives told the defendants that the claim would be covered and they would be fully compensated for their loss. (See defendants' answer, new matter and counterclaim, paragraphs 84-94, 122-123.)

Such a course of conduct could support an action for bad faith, if proven, independent of the issue of the plaintiff filing a declaratory judgment action against its insureds.

We note that the Pennsylvania Bad Faith Statute provides that:

"In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

"(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3 percent.

"(2) Award punitive damages against the insurer.

"(3) Assess court costs and attorneys fees against the insurer." 42 Pa.C.S. §8371.

We also note that bad faith claims are fact-specific and depend on the conduct of the insurer vis-à-vis its insured. *Williams v. Nationwide Mutual Insurance Company*, 750 A.2d 881, 887 (Pa. Super. 2000).

Under Pennsylvania law, "bad faith" is a frivolous or unfounded refusal to pay, lack of investigation into the facts, or a failure to communicate with the insured. *Frog, Switch & Manufacturing Company Inc. v. Travelers Insurance Company*, 193 F.3d 742 (3d Cir. 1999).

Moreover, bad faith is actionable regardless of whether it occurs before, during or after litigation. *O'Donnell ex rel. Mitro v. Allstate Insurance Co.*, 734 A.2d 901 (Pa. Super. 1999); *W.V. Realty Inc. v. Northern Insurance Company*, 334 F.3d 306 (3d Cir. 2003).

So when you read defendants' counterclaim Count III bad faith claim as a whole, it certainly could support a claim under 42 Pa.C.S. §8371.

Therefore, plaintiff's demurrer to defendants' counterclaim for statutory bad faith (Count III) will be overruled, dismissed and denied.

### C. Should Plaintiff's Motion To Sever and Stay Defendants' Counterclaim Until Plaintiff's Declaratory Judgment Action Is Resolved Be Granted or Denied?

Pa.R.C.P. 213(b) states that: "the court, in furtherance of convenience or to avoid prejudice, *MAY,* on its mo-

tion or on motion of any party, order a separate trial of any cause of action, claim or counterclaim, set-off, or cross-suit, or of any separate issue, or of any number of causes of action, claims counterclaims, set-offs, cross-suits or issues."

We note that a trial court's decision on whether or not to bifurcate or sever is left to its unfettered discretion and will not be disturbed absent an abuse of discretion. *Santarlas v. Leaseway Motorcar Transport Co.,* 456 Pa. Super. 34, 40, 689 A.2d 311, 314 (1997); *Grigsby v. Kane,* 250 F. Supp.2d 453 (M.D. Pa. 2003).

Moreover, separate trials should not be allowed where prejudice is not likely to result from a joint trial. *Feld v. Merriam,* 314 Pa. Super. 414, 461 A.2d 225 (1983), *reversed on other grounds,* 506 Pa. 383, 485 A.2d 742 (1984).

Ultimately, the rights of all parties must be balanced. See *Agate v. Dunleavy,* 398 Pa. 26, 156 A.2d 530 (1959).

In the case at hand, plaintiff's declaratory judgment action and defendant's counterclaim for breach of contract and bad faith all stem from the same operative set of facts. To hold two trials would be a waste of the court's resources.

Since this will be a non-jury trial before a judge, the court would be in a good position to control the flow of evidence without attendant jury instructions. Also, items of proof and order of presentation could easily be controlled in a non-jury setting and confusion of a jury with evidentiary issues, burden of proof issues and the like would not exist. Moreover, discovery issues and pres-

entation of evidence are far less likely to result in the confusion that could occur with a jury.

In any event, if the plaintiff prevails on its declaratory judgment claim, there will obviously be no finding for the defendants on their breach of contract and bad faith claims.

Therefore, in balancing all issues, including judicial economy and lack of real prejudice to the plaintiff insurer, we will exercise our discretion and deny plaintiff's motion to sever and stay defendants' counterclaim pending resolution of plaintiff's declaratory judgment action.

A comprehensive order consistent with this memorandum follows.

## ORDER

And now to wit, December 29, 2005, upon due consideration of plaintiff's remaining preliminary objections to defendants' amended answer, new matter and counterclaim, and also upon due consideration of plaintiff's motion to sever and stay defendants' counterclaims, and giving due consideration to the able verbal and written arguments of counsel and in accordance with the foregoing memorandum, it is hereby ordered and decreed that:

(1) All of the plaintiff's remaining preliminary objections to defendants' amended answer, new matter and counterclaim are overruled, dismissed and denied.

(2) Plaintiff's motion to sever and stay defendants' counterclaim is denied.