**In re Philip D. TIGUE, Debtor.**

**Philip D. TIGUE, Plaintiff,**

**v.**

**Eugene A. STEGER, Jr., Defendant.**

**Bankruptcy No. 80–00566K.
Adv. No. 86–0974S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Feb. 12, 1988.

As Amended Feb. 16, 1988.

---

James J. O'Connell, Philadelphia, Pa., Trustee.

Michael B. Kean, West Chester, Pa., for debtor/plaintiff in Adv. No. 86-0974S only.

Christopher G. Kuhn, Philadelphia, Pa., for defendant.

William E. Howell, Jr., Kennett Square, Pa., for debtor in main case.

Philip D. Tigue, West Chester, Pa., debtor.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION AND PROCEDURAL HISTORY

The instant adversary proceeding, before us for disposition after trial, is deeply troubling to us on several levels. First, it presents the most unseemly situation in which the Defendant, a former attorney presently disbarred for matters apparently unrelated to this case, obtained title to the home of a mentally-impaired client, the Debtor herein. This was accomplished through the medium of a court-approved assignment "consented to" in part by the Debtor on the basis of factual misrepresentations by the Defendant, and of which the court approval was obtained without notice to the Debtor. Secondly, the Debtor proceeded *pro se* until the latter stages of the case, and he undoubtedly presented a difficult case to conceptualize and was obviously a difficult client with whom to work. Hence, the record and briefs presented on his behalf lack focus, especially contrasted to the presentation and arguments by competent defense counsel.

In the final analysis, the combination of the strict principles relating to dealings of counsel with their clients, the unethical conduct on the part of the Defendant, and violation of statutory and constitutional requirements concerning procedures for disposition of the property of debtor's estates require us to provide certain relief to the Debtor. We reject the Defendant's argument that we should concentrate not on what the Defendant gained by his conduct, which we believe to have been a windfall of $31,000.00, but on what the Debtor lost thereby, and we therefore award the Debtor damages of $31,000.00.

This bankruptcy case began as a joint Chapter 13 case filed by the Debtor, PHILIP D. TIGUE (hereinafter referred to as "the Debtor"), and his then-wife, NINA ELIZABETH TIGUE, from whom he is now divorced (referred to hereinafter as "Nina"), on March 19, 1980. We shall discuss the relevant portions of the bizarre factual and procedural twists and turns of this case in our Findings of Fact.

The Complaint in the adversary proceeding was filed *pro se* on August 18, 1986, and never has been amended. After the Debtor made several unsuccessful attempts at effecting service, counsel for the Defendant, who was apparently finally served, appeared and filed a Motion to Dismiss on the Defendant's behalf on December 12, 1986. After a colloquy with the Debtor and defense counsel on December 17, 1986, we entered an Order of the following date directing the Defendant to file an Answer by January 20, 1987, and scheduling the trial on March 17, 1987. On March 10, 1987, newly-acquired counsel for the Debtor and counsel for the Defendant entered into the first of a series of five agreements to continue the trial, which we granted with increasing reluctance until the case was finally tried on July 30, 1987. After the trial, we entered an Order of August 4, 1987, requesting the parties to file Proposed Findings of Fact and Conclusions of Law and Briefs after completion of the transcript. All of the submissions were not received by us until January 4, 1988. We are presenting this Opinion in the format of Findings of Fact, Conclusions of Law, and a Discussion, as required by Bankruptcy Rule 7052 and Federal Rule of Civil Procedure 52(a).

### B. FINDINGS OF FACT

1. At the time of the filing of the underlying bankruptcy case, the Debtor and Nina both were represented by Spencer Ervin, Esquire.

2. On March 4, 1981, John A. Wetzel, Esquire, entered his appearance on behalf

of the Debtor, with Mr. Ervin continuing to represent Nina.

3. On January 7, 1982, the law firm of Steger and Howell, of which the Defendant, EUGENE A. STEGER (hereinafter referred to as "the Defendant"), formerly was a principal, entered its appearance on behalf of the Debtor in this case, at which time that firm was also retained to represent the Debtor in his divorce action and custody dispute with Nina.

4. At the time of the filing of this case, the Debtor and Nina owned, by the entireties, real property located at R.D. # 1, Woodview Road, Avondale, Chester County, Pennsylvania (hereinafter referred to as "the Property"). The Property consists of seventeen acres of land, a 24–room farmhouse dating from 1804, and several outbuildings, but is located only ten or fifteen minutes from several population centers.

5. According to the Debtor's Schedules, the value of the Property at the time of filing was $125,000.00, and it was subject to a first and third mortgage held by Southeast National Bank (hereinafter referred to as "Southeast") totalling $65,-748.00; a second mortgage held by First National Bank of West Chester (hereinafter referred to as "1st Nat'l") of $11,-000.00; and a judgment lien in favor of Mary Rose Tigue, the Debtor's sister (hereinafter referred to as "Mary Rose"), in the amount of $13,000.00, totalling $89,748.00. Unsecured debts totalling $6,474.73 were also listed on the Schedules.

6. At the time of the bankruptcy filing, the Debtor and Nina were in default under their obligations to both Southeast and 1st Nat'l, and Southeast had obtained a foreclosure judgment and had scheduled a sheriff's sale of the Property to execute upon same.

7. On August 13, 1980, Southeast filed a Motion to convert the matter to a case under Chapter 7, which was granted on September 12, 1980, and James J. O'Connell, Esquire, was ultimately appointed as Trustee.

8. On October 30, 1980, an Order was entered by this Court in Adv. No. 80–0195K, whereby the automatic stay provided by Section 362 of the Bankruptcy Code was terminated as to Southeast.

9. On December 11, 1980, the Trustee obtained court authorization to offer the property at public sale. Thereafter, Southeast, the Trustee, and Counsel for the Debtor entered into a Stipulation approved by this Court on February 13, 1981, which, *inter alia*, allowed the Trustee to employ an auctioneer to sell the property free and clear of liens and encumbrances.

10. On March 4, 1981, the Debtor moved to convert the case to a Chapter 11 proceeding, which was denied on May 5, 1981. Thereafter, a Motion to reconsider this Order was denied, and an appeal was taken.

11. On February 9, 1982, shortly after his entry into the case, the Defendant filed a new Application to convert this case to Chapter 11 on behalf of the Debtor. While all of these attempts to re-convert the case to Chapter 11 were ultimately unsuccessful, they delayed disposition of the Property by the Trustee.

12. On December 24, 1981, Southeast commenced an action objecting to the Debtor's discharge, at Adv. No. 81–1978K, which resulted in an Order of March 11, 1982, denying the Debtor's discharge on the basis of 11 U.S.C. § 727(a)(6)(A), due to the failure of the Debtor to cooperate with the prior Orders pertaining to the sale of the Property.

13. On October 29, 1982, after a successful bid was made to purchase the Property by one John Royer Lloyd at a bankruptcy court auction, the Court ordered that the Trustee take all steps necessary to remove the Debtor from the Property.

14. When the sale to Mr. Lloyd was not consummated due to a problem in obtaining title insurance, Southeast, on or about November 30, 1982, filed a Confession of Judgment in Ejectment against the Debtor in the Court of Common Pleas of Chester County, Pennsylvania, to remove him from the Property.

15. By this time, the Defendant's firm claimed that they were owed a bill in ex-

cess of $13,000.00 by the Debtor for services rendered which was unpaid.

16. As a result of the Debtor's failure to pay this bill, the Defendant attempted to withdraw his and his firm's representation of Tigue by filing a "Praecipe to Withdraw" as his counsel with this Court on December 9, 1982. However, upon objection to same by Southeast, these attempts to withdraw as counsel were denied on February 9, 1983.

17. After the Debtor was removed from the Property, he continued to return thereto, and was arrested for trespass on a number of occasions and brought before a local District Justice of the Peace, the fourth arrest for which occurred on December 13, 1982.

18. On December 14, 1982, the Debtor went to the home of the District Justice with a gun and held the District Justice and his wife hostage for a number of hours until certain of his demands were met, including a stay of eviction proceedings against the Debtor.

19. The Defendant was contacted by police and became involved in the negotiations with the Debtor concerning the release of the hostages, which occurred after an Order so providing was entered by District Judge Clarence C. Newcomer, which was later vacated by that Court on its own motion.

20. Thereafter, the Debtor surrendered and was arrested and charged with kidnapping the District Justice and his wife.

21. As a result of his arrest on criminal charges arising from this incident, the Debtor remained in custody at various institutions from December 14, 1982, until April 15, 1986.

22. When initially imprisoned, the Debtor was unable to eat, sleep, or function. Therefore, from December, 1982, until May, 1983, the Debtor was removed to confinement in Norristown State Hospital, a mental institution, where he continued to suffer from disorientation, premonition of death, and inability to eat.

23. Although the Debtor was represented by the Public Defender's Office in reference to his criminal charges, the Defendant, on Saturday, February 26, 1983, obtained access to visit the Debtor at Norristown State Hospital, apparently by misrepresenting his status as the Debtor's criminal lawyer.

24. The purpose of the Defendant's visit was to obtain the Debtor's consent to acquisition of the Property by the Defendant and his fiancée by means of the Defendant's purchasing assignments of the interests of the lien creditors. Thus, the Defendant planned to acquire and utilize the Property as a residence for himself and his fiancée, whom he later married.

25. The Defendant promised the Debtor that, if he consented to the assignment of the Property to him, the Defendant would successfully represent him in his criminal proceeding and his marital and child custody disputes with Nina, forgive his present bill for fees, allow him to retain a five-acre portion of his property, and obtain employment for him upon his release.

26. The Debtor testified that he would have given anything for assistance in his affairs at that time and, in reliance upon the Defendant's representations, especially given his impaired mental state, the Debtor orally agreed to consent to the transaction.

27. On the next Saturday, March 5, 1983, the Defendant returned to visit the Debtor at Norristown State Hospital with a prepared written consent to the assignment of the mortgage of Southeast only to the Defendant, which the Debtor signed in reliance of the aforesaid representations.

28. The Defendant testified that he observed the mental state of the Debtor as "keen" on both above occasions. When asked how his mental state at that time compared to that at present, the Defendant stated that it was "relatively the same" as of the time of the trial.

29. The Court observed that the Debtor presented himself emotionally flat and hence obviously mentally impaired to a significant degree during the trial. Further, shortly after the Debtor signed the consent, he was examined at Norristown State Hospital and recommitted for an additional

three months, suggesting that his condition was considerably worse at that time than at the time of the trial.

30. The Defendant never visited the Debtor again during the remainder of his commitment to Norristown State Hospital nor at any time thereafter. He did send letters to the Debtor in April, 1983, discussing the criminal matter, and in May, 1983, advising of his negotiations with Nina and Mary Rose, the tone and content of which suggested the Defendant's continued assurances of future assistance and good will to the Debtor.

31. The Defendant testified that he made no efforts to ascertain the mental state of the Debtor prior to obtaining his consent to the assignment, and stated that he was unaware of his impaired mental state.

32. Also, the Defendant admittedly never advised the Debtor to obtain independent advice from other counsel as to the consent to the assignment or about this matter generally.

33. On March 16, 1983, the Defendant entered into an agreement to purchase the interest of 1st Nat'l, then owed in excess of $13,000,00, for $8,000.00.

34. On March 17, 1983, the Defendant entered into an agreement to purchase the interest of Southeast, then owed the sum of about $100,000.00, for $70,000.00.

35. Both agreements included a clause providing that the agreement "is expressly conditioned upon the approval" of the agreement by this Court, "after notice to all interested parties."

36. On June 10, 1983, Mary Rose assigned her judgment, in excess of $16,500.00, to the Defendant in return for payment of $10,000.00.

37. In addition to the foregoing sums, the Defendant paid $6,000.00 to Nina for assignment of her interest in the Property,

thus making the total paid by him $94,000.00.[1]

38. On June 9, 1983, the Defendant filed an Application for Approval of Assignment with the Bankruptcy Court, which sought Bankruptcy Court approval of the assignments of the interests in the Property described in paragraphs 33, 34, 36, and 37 *supra*, to himself. The Application stated, *inter alia*, that the Defendant represented the Debtor in the bankruptcy, and that the Debtor consented to the "assignment" (the consent only related to the Southeast assignment). A notice was prepared to be sent to all interested parties on which the Defendant was designated as the Debtor's counsel.

39. The notice stated that an answer or objection to court approval of the assignment request could be filed within twenty (20) days.

40. However, on or just prior to June 15, 1983, the Defendant filed a motion seeking expedited consideration of the matter, which contained a certification that notice of the filing of that motion had been given telephonically to the Debtor, therein listed as appearing "pro se," with an address of Norristown State Hospital.

41. On June 15, 1983, this Court granted the motion for expedited consideration, and entered an Order scheduling a hearing on the matter at 11:00 A.M. that same day. Later that same day an Order was entered approving all of the assignments to the Defendant and further ordering that the automatic stay was terminated as to the Defendant.

42. The Defendant testified at trial that he did not actually send nor otherwise provide the Debtor with notice of the June 15, 1983, hearing at which court approval of the assignments was sought and obtained, nor did he believe that any other party had provided such notice. The Debtor con-

---

1. At one point in the hearing, the Defendant suggested that he anticipated needing a loan to pay real estate taxes of $7,553.00 and sheriff's costs of about $1,800.00. However, there is no direct testimony that any such sums were paid. In his proposed Findings of Fact, his counsel, without any explanation of his basis for calcula- tion of same, stated that the Defendant's expenditures totalled "approximately $97,400.00 to acquire clear title to the property." The record thus provides no direct basis for concluding that the Defendant paid more than $94,000.00 to acquire the Property.

firmed that he had received no notice of the hearing or the entry of the Order.

43. Southeast had scheduled a sheriff's sale of the Property on June 17, 1983. The Defendant, as assignee of Southeast's judgment, purchased the Property at that sale for a bid of one ($1.00) dollar.

44. After acquiring the Property, the Defendant had little communication with the Debtor and performed no perceptible services on his behalf. He advised the Debtor in letters of August and September, 1983, that he could not represent him in the criminal proceedings because he was a witness to some of the events and therefore had a conflict and provided him with basically only a status report of his custody and visitation proceedings.

45. The Defendant testified at trial that he would not give the five-acre plot to the Debtor, claiming that he had only ever agreed to give him an option to purchase it, contrary to the Debtor's claim that he agreed to give it back to the Debtor, and that, because of chagrin due to the Debtor's present suit against him, he was not willing to give him anything at this time.

46. The letters and testimony support the Debtor's testimony that the Defendant did indeed promise to represent him in the criminal proceeding and in his domestic relations matters and to give him certain rights in the five-acre plot, but that the Defendant reneged on these promises after the Property was safely in his name. We therefore credit the testimony of the Debtor that the promises recited in paragraph 25, page 9 *supra,* were in fact made by the Defendant.

47. The Debtor testified that he purchased the Property at an auction in October, 1974, for $86,300.00, and that it was worth $240,000.00 to $250,000.00 as of June 17, 1983.

48. As support for his valuation, the Debtor stated that he had performed all facets of construction work since 1948, had successfully rehabilitated several urban shells, and had put this experience to use in rehabilitating the Property. Specifically, he stated that he had completed a small apartment which he rented to one Robert Sigafoos and a three-bedroom apartment in which he had resided with his children.

49. The Defendant called James A. Gallo, Jr., who appraised the property at the request of Elmwood Federal Savings & Loan, from whom the Defendant had unsuccessfully applied for a mortgage in March, 1983, as an expert witness. Mr. Gallo testified that, at the time of his appraisal, the Property had a market value of $110,000.00 and a "quick sale value" of $95,000.00, although Mr. Gallo further stated that "the value will be greatly increased" by renovation.

50. Mr. Gallo's numerical results were reached by "comparative market data" with three properties which were not described to any degree, and the proximity of which to the favorable location of the Property was not described. Mr. Gallo's testimony revealed no real recollection of the Property, indicating an unawareness of Mr. Sigafoos, whose presence the Defendant's testimony confirmed. Also, we note that an appraisal report of Mr. Gallo, offered into evidence, which he stated was a subsequent copy and summary of the report actually prepared in March, 1983, had described the condition of all aspects of the Property except the windows, which he described as "poor," as either "fair" or "good."

51. The Defendant claimed that the Property was only worth $90,000.00 to $100,000.00 as of June 17, 1983. However, although admitting the presence of Mr. Sigafoos, the Defendant described the condition of the Property as uninhabitable, and significantly worse than indicated by Mr. Gallo in his appraisal.

52. Weighing all of the foregoing testimony, we determine that the fair market value of the premises, as of June 17, 1983, was $125,000.00.

53. The Defendant testified that he and his wife and family moved into the Property about one and a half years after they purchased it, and that they had invested approximately $200,000.00 in repairing it.

54. The Defendant testified that he "resigned or consented to disbarment" from

the practice of law in February, 1985, for a period of five years, apparently as a result of incidents not related to the subject matter of this proceeding.

55. The only activity in the Debtor's main bankruptcy case since 1983 was the Trustee's conducting a § 341 meeting on July 15, 1987, which only the Debtor attended, and an Order of August 25, 1987, dismissed the bankruptcy petition as to Nina only for her failure to attend the § 341 meeting.

56. The Debtor also filed a "praecipe" to convert this case to a Chapter 12 case shortly before the hearing, which we indicated was barred by its earlier conversion from Chapter 13. *See* 11 U.S.C. § 706(a).

## C. CONCLUSIONS OF LAW

1. As counsel for the Debtor at the time he acquired the Property, the Defendant was barred from making any profit from his acquisition of the Property and is accountable to the Debtor for any gains which he realized therefrom.

2. The Defendant's conduct of self-dealing with, and purchasing of, his own client's property at a foreclosure sale, was violative of the Canons of Professional Ethics and independent substantive law.

3. The Defendant's failure to assure that the Debtor received notice of the hearing at which he obtained court approval of the assignments, which approval was a necessary condition of those assignments, also taints the Defendant's acquisition of the property.

4. Given the long period of time between the acquisition of the Property by the Defendant and the institution of this proceeding, and the unrebutted testimony that the Defendant has made considerable improvements to the Property in the interim, it would be unjust to invalidate the Defendant's acquisition of the Property.

5. The appropriate remedy is monetary damages to the Debtor in the amount of the Defendant's profit from his acquisition of the Property, i.e., the difference between the value of the Property at the date of acquisition ($125,000.00) and the amount actually paid by the Defendant ($94,000.00) or $31,000.00.

## D. DISCUSSION

### 1. AN ATTORNEY IS PROHIBITED FROM OBTAINING FINANCIAL GAIN THROUGH ACQUISITION OF HIS CLIENT'S PROPERTY

■ The guiding principles of this case are set forth by the Supreme Court of Pennsylvania in *Meara v. Hewitt*, 455 Pa. 132, 135–36, 314 A.2d 263, 265 (1974), where the court quotes from its earlier decisions as follows:

> In *Kribbs v. Jackson*, 387 Pa. 611, 129 A.2d 490 (1957), we laid out the standard of conduct that must prevail between an attorney and client regarding business transactions between the two. We stated: "That relation [attorney and client] is so confidential in its nature that it calls for the exercise of the most perfect good faith. In transactions between counsel and client, no shadow of anything like deception or unfair dealing upon part of an attorney can be countenanced. In every case in which complaint is made, the courts will scrutinize the transaction with jealous care to see that there is no relaxation of the rule. Owing to confidence bestowed upon him, the attorney is presumed to be able to strongly influence his client; hence, the law often declares transactions between them void which between other persons would be unobjectionable. Unless the transaction is fair and conscionable, it is deemed a constructive fraud." At pages 621–22.
>
> In *Points v. Gibboney*, 340 Pa. 522, 17 A.2d 365 (1941), we stated: "The burden is upon him, as attorney, to show that he did not gain a personal advantage by misrepresenting the legal situation ro by failing to make it plain to those whom it was his duty to advise and protect." At page 527.

*Accord, e.g., Ruth v. Crane*, 392 F.Supp. 724, 729–30 (E.D.Pa.1975); 7 AM.JUR.2d 242–45 (1980).

It is therefore well settled that an attorney cannot acquire the interest of his client in any foreclosure proceeding. *See, e.g.,*

*Casari v. Victoria Amustment Enterprises,* 327 Pa. 382, 387–89, 194 A. 503, 506–07 (1937); *Elliott v. Tyler,* 3 Sadler (Pa.) 584, 6 A. 917, 918 (1886); *Henry v. Raiman,* 25 Pa. 354, 358–59 (1855); Annot., *Duties, Rights and Remedies Between Attorney and Client Where Attorney Purchases Property of Client at or Through Tax, Execution, or Judicial Sale,* 20 A.L.R.2d 1280, 1282–84 (1951); and 7 AM.JUR.2d, *supra,* at 243–44.

The Defendant here was clearly representing the Debtor at the time of the acquisition of the Property in issue in this very bankruptcy case. As of February 9, 1983, just four months before its acquisition by the Defendant, this Court had expressly denied the Defendant's request to withdraw as the Debtor's counsel. Moreover, even a subsequent withdrawal would be unlikely to have affected the applicability of this principle. *See Casari, supra,* 327 Pa. at 385–86, 194 A. at 505–06; and *Henry, supra,* 25 Pa. at 358–59.

The Defendant's counsel attempts to minimize the nature of the interest of the Debtor in the Property as of the date of the June 17, 1983, sale. However, the conclusion is nevertheless inescapable that the Defendant-attorney was the purchaser of the Debtor-client's Property at a sheriff's sale executing upon a judgment against the Debtor-client on June 17, 1983. It was by that sale that the Debtor lost his title to the Property and the Defendant acquired his title. Thus, the Defendant directly committed the forbidden act of acquiring his client's property at a foreclosure sale.

■ We do not believe that the Defendant's actions can be viewed in a better light even if we conclude that the transactions more significant than the sale itself were the assignments of the creditors' respective interests to the Defendant. These transactions did not directly involve the Debtor, and thus, as the Defendant argues in effect, the sale was itself an unnecessary formality for which the Defendant opted merely to place the transaction into the light of day.

The assignments from the two mortgagees, including Southeast, the judgment creditor which had scheduled the foreclosure sale, to the Defendant were expressly conditioned upon court approval after notice to all interested parties. Putting aside the notice issue, which creates additional problems for the Defendant, the Debtor's executed consent was pivotal to the court approval, and most likely as well to the willingness of the mortgagees to execute the assignments. The consent is besmirched, however, by (1) Its reference to only the assignment of Southeast's claim to the Defendant, not the other assignments to him; (2) The Defendant's misrepresentations to the Debtor, reliance upon which we believe were the only reason that the Debtor in fact did sign the consent; and (3) The Debtor's questionable mental competency at the time of executing the consent which, despite the Defendant's transparent protestations at the hearing, must have been obvious to the Defendant and were preyed upon by him. Given the Defendant's fiduciary duty of undivided loyalty to the Debtor arising out of the attorney-client relationship, *e.g., In re Greater Pottstown Community Church of the Evangelical Congregational Church,* 80 B.R. 706, 710–11, 712 (Bankr.E.D.Pa. 1987); *Kribbs, supra,* 387 Pa. at 621–22, 129 A.2d at 495–46; and *Henry, supra,* 25 Pa. at 358–59, the Defendant's misrepresentations to his mentally-impaired client as a means of obtaining his approval to the assignments at a time when the Debtor's resistance was obviously weakened is nothing short of odious. Therefore, focus on the assignments instead of the sheriff's sale does not cause the Defendant to fare better in the reaching of our conclusion that the Defendant breached his fiduciary duties to the Debtor in consummating this transaction.

## 2. SUCH ACTIONS ALSO VIOLATE THE CODE OF PROFESSIONAL RESPONSIBILITY

■ Any action taken by an attorney "with a view ... of obtaining some advantage for himself to the prejudice of his client, justifies disbarment." *Annot., Attorney & Client: Disciplinary Proceeding*

*Based upon Attorney's Direct or Indirect Purchase of Client's Property*, 35 A.L.R.3d 674, 676 (1971). Acting "in a fraudulent or overreaching manner to advance his own interests to the possible detriment of his client" therefore may justify an attorney's disbarment, irrespective of injury to the client. *Id.* at 676–77.

These considerations are reflected in Disciplinary Rules (hereinafter referred to as "DR") 5–103(A) and 5–104 (A) of the American Bar Association's Code of Professional Responsibility, adopted by the Supreme Court of Pennsylvania on February 27, 1974, which read as follows:

> DR 5–103. Avoiding Acquisition of Interest in Litigation
>
> (A) A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation he is conducting for a client, except that he may:
>
> (1) Acquire a lien granted by law to secure his fee or expenses.
>
> (2) Contract with a client for a reasonable contingent fee in a civil case....
>
> DR 5–104. Limiting Business Relations with a Client.
>
> (A) A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure....

Similar considerations are also addressed in Rule 1.8(a) of the American Bar Association's Rules of Professional Conduct, which will, by Order of the Pennsylvania Supreme Court of October 16, 1987, replace the Code of Professional Responsibility in Pennsylvania, effective April 1, 1988, which reads as follows:

> RULE 1.8 Conflict of Interest: Prohibited Transactions
>
> (a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:
>
> (1) the transaction and terms on which the lawyer acquires the interest are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;
>
> (2) the client is advised and is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and
>
> (3) the client consents in writing thereto.

The Defendant argues that he did not violate either of these ethical precepts, specifically alleging that he satisfied the conditions of Rule 1.8(a) because the terms of the transaction were fair to the Debtor, the Debtor was made aware of them, and the Defendant "structured the transaction" so as to render them conditional upon the Debtor's approval, thus indicating his sensitivity to the fact that he was dealing with his client.

We disagree that no violation of these ethical precepts occurred. The transaction was not fair, because the Debtor did not receive what he bargained for. He did not receive representation from the Defendant in either his criminal case nor in his domestic relations matters, nor did he receive the five-acre tract. In fact, he received largely empty promises and possibly the Defendant's forebearance from trying to collect his probably uncollectible legal fee bill.

The terms of any agreement between the parties were never set forth in writing. The consent form, the only writing, makes reference only to the assignment from Southeast to the Defendant. The Debtor signed the consent form only because of his expectation that the Defendant's performances were forthcoming. These expectations were, however, never realized.

There is no evidence as to who "structured" the transactions to require court approval of the assignments after notice. It may well have been the mortgagees, not the Defendant. In any event, the notices to all interested parties required by the terms of the Southeast and 1st Nat'l assignments were not given, and thus the

transaction, as further indicated below, failed to conform to its designed structure.

We believe that the Defendant clearly did acquire a proprietary interest in the Debtor's cause of action in violation of DR 5–103(A), and that the Defendant entered into a business transaction with the Debtor of which the latter was not accorded full disclosure, in violation of DR 5–104(A). Clearly, the full terms of the transaction were not disclosed in writing and the Debtor was given no advice of his opportunity to seek independent counsel, in violation of Rule 1.8(a).

We acknowledge the holding of the Pennsylvania Supreme Court in *In re Estate of Pedrick*, 505 Pa. 530, 535, 482 A.2d 215, 217 (1984), that the Code of Professional Responsibility does not have the force of establishing independent substantive law. However, these violations of the Canons and Rules governing professional conduct are clearly properly subject of consideration by the Disciplinary Board of the Supreme Court of Pennsylvania, and therefore we are submitting a copy of this Opinion to that body.

We recognize the irony of making such a report in light of the fact that the Defendant was already disbarred from the practice of law in 1985. It is hardly comforting to know that the Defendant may have engaged in other conduct comparable to that in issue here, which resulted in his disbarment. However, it may be that such a report will have a bearing upon any application by the Defendant for reinstatement or readmission to the bar of this Commonwealth.

Finally, we note the statement of Judge Fox in *In re Mushroom Transportation Co.*, 70 B.R. 416, 418 n. 4 (Bankr.E.D.Pa. 1987), that violations of disciplinary rules which are consistent with independent substantial law *may* serve as the basis for substantive legal conclusions. Clearly, there is ample independent substantive law barring attorneys from dealing unfairly with their clients in property transactions. *See* pages 731–732 *supra.* Therefore, we believe that the Defendant's violation of

disciplinary rules of the legal profession are also relevant to our disposition.

### 3. PERTINENT BANKRUPTCY LAW DECISIONS FURTHER ESTABLISH THE IMPROPRIETY OF SUCH ACTIONS

The case which we find most closely analogous to the instant case is *In re Exennium, Inc.*, 23 B.R. 782, 786–88 (9th Cir. Bankr.App.1982), *rev'd on other grounds*, 715 F.2d 1401 (9th Cir.1983). There, an attorney who had previously represented the Debtor and whose firm had successfully withdrawn as its counsel, purchased the assets of the Debtor at a trustee's sale subsequent to the firm's withdrawal. The Court, holding that previous counsel was absolutely disqualified as a buyer, held that the purchase, being in conflict with the client's interest and contrary to public policy, was void. *See also Donovan & Schuenke v. Sampsell*, 226 F.2d 804 (9th Cir.1955) (party assisting trustee in management of estate cannot purchase at trustee's sale); and *In re Frazin & Oppenheim*, 181 F. 307 (2d Cir.1910) (appraiser of estate, as well as any agents of parties involved in a bankruptcy sale, including attorneys, cannot purchase at sale).

Here, the facts that the Defendant was attorney of record for the Debtor at the same time that he purchased the Property at the sale, and the added elements of (1) his failure to provide notice of the court hearing where the assignments were approved to the Debtor, (2) his misrepresentations as to what he intended to do for him, and (3) his taking advantage of the Debtor's impaired mental state, render the factual setting here more aggravated than that in *Exennium, supra.* The instant transaction thus cannot be allowed to pass by the eye of the court without adverse consequences for the Defendant.

### 4. FAILURE TO PROVIDE NOTICE TO THE DEBTOR OF THE COURT HEARING TO APPROVE ASSIGNMENTS FURTHER TAINTS THIS TRANSACTION

All of the foregoing considerations are heightened by the further defect in the sale

process arising from the absence of notice to the Debtor of the hearing to consider approval of the assignment to the Defendant, which might itself be a sufficient basis for setting aside this court's Order of June 15, 1983, and, consequently, the assignments.

As has already been pointed out in our discussion at page 732 *supra,* court approval of the assignments was not a mere technicality to further solidify the legality of a transaction otherwise beyond reproach, but was a contractual precondition of the assignments of Southeast and 1st Nat'l to the Defendant. Especially given the sensitivity of dealing with property with which his client, to the point of grossly antisocial violence, was unwilling to part, it was particularly important for the Defendant to be punctilious in obtaining court approval of the assignment.

As it developed, the motion was filed on June 9, 1983, and a notice of the hearing to consider approval of the assignments was prepared. Listed as counsel for the Debtor thereon was the Defendant, belying his contention at trial that he no longer believed that he was representing the Debtor as of that date, and assuring that whether or not the Debtor received actual notice would be in the sole hands of the Defendant.

Although the notice stated that an answer or objection could be filed within twenty (20) days thereafter, the Defendant cut short that process by moving for an expedited hearing. Accompanying the motion for expedited consideration was a certification that notice of the filing of that motion had been given telephonically to the Debtor, therein listed as appearing "pro se," with an address of Norristown State Hospital. As the Defendant admitted at the hearing, no notice of either the substantive motion or the motion for expedited treatment was in fact given to the Debtor, either telephonically or in writing. Thus, the Defendant's Certification of such notice was false.

The Court, obviously concluding that notice had been provided to all parties and presented with the consent form (obtained by means of misrepresentations) signed by the Debtor, apparently further concluded that all interested parties, including the Debtor, joined in the motion. The hearing was set by Order of June 15, 1983, at 11:00 A.M. that same day and approved at that time or shortly thereafter, as the Order is dated June 15, 1983.

Improper notice of a sale to interested parties renders the sale voidable by the parties who were entitled to receive such notice, but who in fact failed to receive same. *See M.R.R. Traders, Inc. v. Cave Atlantique, Inc.,* 788 F.2d 816 (1st Cir. 1986); and *In re Fernwood Markets,* 73 B.R. 616 (Bankr.E.D.Pa.1987). As the *Fernwood Markets* case points out, due process rights of constitutional dimension are implicated if a sale takes place without adequate notice to interested parties. *Id.* at 620. *See also Ray v. Norseworthy,* 90 U.S. (23 Wall) 128, 23 L.Ed. 116 (1874). The bankruptcy court Order could not ratify a transaction of which notice was defectively provided. *See In re Gem de Puerto Rico, Inc.,* 79 B.R. 142 (D.P.R.1987). Hence, the numerous irregularities in the notice of the hearing on whether to approve the assignments, resulting in the failure of the *most* interested party to receive *any* notice of the proceedings, render their validity questionable. Therefore, this basis, independent from, but aggravated by, the Defendant's self-dealing with the property of his client, provides the Debtor with another basis upon which to attack the transaction in issue.

We therefore conclude that the Defendant, in several aspects, illegally acquired the Property. Another difficult question arises, however, in ascertaining the remedy to which the Debtor is entitled.

## 5. DAMAGES

■ The classic remedies of a client whose property has been sold to his attorney is the imposition of a constructive trust impressed upon the property in the hands of the attorney and a setting aside of the sale in issue. *See* 7 AM.JUR.2d, *supra; Annot., supra,* 20 A.L.R.2d at 1306–09. However, the passage of time and the dra-

matic enhancement of the Property by the Defendant in the interim cause us to conclude that, in this instance, setting aside the sale or imposing a constructive trust against the Defendant would be inequitable. There is, moreover, some force in the Defendant's argument that the Debtor did not have a very valuable interest in the property as of June 15, 1983. Had it not been for the Defendant's intervention, albeit, we believe, for scarcely altruistic motives, it appears that the Debtor would have had all of his rights to the property wiped out in a sheriff's sale conducted by Southeast two days later on June 17, 1983.

■ Therefore, we choose to allow the sale to stand and to require the Defendant to disgorge the financial benefit which he personally gained from the transaction to the Debtor as the Debtor's sole remedy. This financial benefit, we believe, is measured by the difference between the fair market value of the Property on June 17, 1983, the date of the sale to the Defendant, and the amount paid by the Defendant to acquire it.

■ We reject the Defendant's suggestion that we should measure the damages by ascertaining what the Debtor lost rather than by ascertaining what the Defendant gained in the transaction. Thus, in *Henry, supra,* the court holds that the attorney's purchase "enures [sic] to the benefit of his client." 25 Pa. at 359. Further, in *Kribbs, supra,* where the defendant-attorney conspired with a realtor to remit only the previous rental to the plaintiff-landowner and pocket increased rentals, the court rejected the attorney's plea that the plaintiff suffered no losses and hence no damages

should be awarded to him against the attorney. Rather than focusing upon the plaintiff's losses, the court held that the parties' fiduciary relationship required the attorney to pay over any gains on his part to the client.

■ We believe that here, where the Defendant's breaches of his fiduciary duties were nothing short of egregious, the same principles should apply. The victimized Debtor should be the recipient of the profit realized by the Defendant in the transaction. As indicated, this figure should be the difference between the value of the Property and what the Defendant paid for it at the crucial time of the sheriff's sale.[2]

Valuations of real property are always difficult to make but are frequently required of us, and thus we have developed our own body of law relevant to this topic. While the testimony of the owner of the property is always entitled to some weight, *e.g., In re Corbett,* 80 B.R. 32, 36 (Bankr.E. D.Pa.1987); and *In re Blakey,* 76 B.R. 465, 469 (Bankr.E.D.Pa.1987), *modified on other grounds,* 78 B.R. 435 (Bank.E.D.Pa. 1987), here we have two "owners" whose ranges of value differ by no less than $150,000.00, *i.e.,* the Debtor's valuation of $240,000.00 to $250,000.00, as compared to the Defendant's valuation of $90,000.00 to $100,000.00.

We also have the "expert" testimony of Mr. Gallo. However, as we pointed out in *In re Chandler,* 77 B.R. 513, 517 (Bankr.E. D.Pa.1987); and *Blakey, supra,* 76 B.R. at 471–72, valuations by professional appraisers which are based principally on comparable sales data are worth very little when the appraiser fails to indicate direct famil-

2. We consider this means of measuring damages as akin to enforcing a trust as to real property. We believe that this remedy, as well as the underlying action, is therefore so closely related to be within the scope of 42 Pa.C.S. § 5531(1), and thus not be subject to any statute of limitations. In any event, this action was commenced within four years of its accrual on June 17, 1983, and we therefore reject the Defendant's contention that the action is barred by limitations or laches. The only other applicable statute of limitations is arguably the five-year limitation of 42 Pa.C.S. § 5526(3) or the six-year period of 42 Pa.C.S. § 5527(6). We are unwill-

ing to hold that an action brought within an applicable limitation period is barred by laches, as the limitation period is the frame of reference for ascertaining same. *See, e.g., Metropolitan Wire Corp. v. Falcon Products, Inc.,* 528 F.Supp. 897, 902–03 (E.D.Pa.1981). We also note that the Debtor was and apparently still is suffering under a mental impairment, and that he commenced the action shortly after his release from custody. Considering these circumstances also causes us to conclude that the action is barred either by limitations or by laches. *Cf. Eubanks v. Clarke,* 434 F.Supp. 1022, 1032–33 (E.D.Pa.1977).

iarity with either the properties used as comparables or the subject property to which the property is compared. Here, Mr. Gallo's appraisal suffers from *both* deficiencies. His description of the Property was at variance from that of both owners. He overlooked the tenant living in the premises. His written report was consistent with the Debtor's testimony that the major systems in the home were functional, but his oral presentation was more consistent with the Defendant's contention that the premises was uninhabitable. Further, his comparables were not described in any detail, and were, in at least one instance, so distant from the subject premises as to be totally irrelevant. We therefore decline to attach much significance to Mr. Gallo's testimony or report, although we believe that it pegged the Debtor's estimate as more likely to be skewed than that of the Defendant.

Ultimately, we chose a medium ground of $125,000.00 as the figure which we believe was the fair market value of the Property as of June 17, 1983. We note that this is coincidentally the same value placed upon the premises by the Debtor and Nina in their bankruptcy schedules. Hence, as in *In re Cole, Cole v. Sovran Mortgage Corp.*, 81 B.R. 326, 327–29 (Bankr.E.D.Pa.1988); and *Blakey, supra*, 76 B.R. at 422, it is a figure given by one of the parties at a time when that particular party had no apparent bias.

The Defendant's expenditures to acquire the Property are difficult to measure with exact precision. We know that the sum of what he paid Southeast, 1st Nat'l, Mary Rose, and Nina was $94,000.00, and nothing else is certain. See page 729 & n. 1 *supra*. Having no other figure of record, we are compelled to accept the $94,000.00 figure as the Defendant's expenditures and to measure the Defendant's benefit at $125,000.00 less $94,000.00, or at $31,000.00. This is the sum which we shall order him to pay to the Debtor as damages.[3]

---

**3.** We believe that we could and would award the Debtor *approximately the same damages* even if we approached the issue from the vantage point of *the Debtor's losses,* as opposed to the Defendant's benefits from the transaction, and thereupon determined his compensatory damages to be much less, because we believe this to be a case in which, had damages been nominal, we would have imposed punitive damages. As the RESTATEMENT (SECOND) OF TORTS, § 908, comment c, at 465 (1979), points out, punitive damages are awarded "where there is substantial harm and when there is none," and even where only nominal damages are awarded to the plaintiff. The keynote of the amount awarded is "the motives of the wrongdoer, the relation between the parties and the provocation or want of provocation for the act." *Id.*, comment e, at 466.

The foregoing principles of the Restatement have been expressly approved by the Pennsylvania federal courts, *e.g., Chuy v. Philadelphia Eagles Football Team*, 595 F.2d 1265, 1277 (3d Cir.1979), and state courts, *e.g., Feld v. Mirriam*, 314 Pa.Super. 414, 434, 461 A.2d 225, 235 (1983); and *Rhoads v. Heberling*, 306 Pa.Super. 35, 39–42, 451 A.2d 1378, 1380–81 (1982). The principles established therein have been followed by these and other courts. In particular, substantial damages have been awarded even where compensatory damages were non-existent or were relatively small. *See, Chuy, supra* ($60,000.00 punitive damages awarded as opposed to $10,000.00 compensatory damages); *Berner Aviation, Inc. v. Hughes Helicopter, Inc.*, 621

F.Supp. 290, 299–301 (E.D.Pa.1985) (punitive damages of about $1,000.00 awarded as opposed to only about $11,500.00 compensatory damages); *Marcone v. Penthouse International, Inc.*, 577 F.Supp. 318, 322, 35–36 (E.D.Pa.1983) (punitive damages of $200,000.00 awarded as opposed to only $30,000.00 compensatory damages); *In re Wagner*, 74 B.R. 898, 905–06 (Bankr.E.D.Pa.1987) (punitive damages of $500.00 awarded, although slight degree of harm justified compensatory damages of only $100.00); *Feld, supra*, 314 Pa.Super. at 437–38, 461 A.2d at 237 (punitive damages of $1.5 million and $.75 million awarded, as opposed to compensatory damages of $2 million and $1 million, to respective plaintiffs); and *Rhoads, supra*, 306 Pa.Super. at 37, 47, 451 A.2d at 1379, 1383–84 (punitive damages ranging from $600.00 to $750.00 awarded, although compensatory damages ranged from nothing to $446.47).

Following these cases, we could clearly award $31,000.00 in punitive punitive damages, even if we found no comparable compensatory damages, to the Debtor. The violation of his rights at the hands of the Defendant would entitle the Debtor to at least nominal damages. *See Carey v. Piphus*, 435 U.S. 247, 266–67, 98 S.Ct. 1042, 1054, 55 L.Ed.2d 252 (1978).

The element which would *set off* punitive damages here is the abuse of the fiduciary relationship between the parties. The motives of the Defendant appeared solely to "use" the Debtor's circumstances to obtain his "consent" to obtain his property. Having obtained same, the De-

# 738

## 6. CONCLUSION

■ Finally, the odd status of the main bankruptcy case presents a problem as to whom the sum awarded should be paid. The bankruptcy case is still open, but the Debtor has been denied a discharge. It is unclear to us whether, given this state of affairs, this recovery should be considered property of the Debtor's bankruptcy estate, pursuant to 11 U.S.C. §§ 541(a)(1) or (a)(7), or not.

Near the close of the proceedings on July 30, 1987, the Debtor stated that he "never wanted his bills dismissed" in the bankruptcy. Presumably, then, the Debtor would not object to the first distribution of the proceeds of recovery herein to his unsecured creditors existing at the time of the conversion, i.e., as of October 20, 1980. We shall therefore order that the sum paid be remitted to the Trustee and that the Trustee shall file a report of the proposed distribution, with opportunity to interested parties to object thereto, similar to the procedure utilized by us in *In re Chapman*, 77 B.R. 1, 7–8 (Bankr.E.D.Pa.1987).

Finally, we believe that the administration of this case, now one of the oldest on our docket, must be brought to a rapid conclusion now that its only *raison d'etre*, this adversary proceeding, is decided. A timetable for doing so is attached hereto. We remind William E. Howell, Jr., Esquire, the Defendant's ex-partner, that, somewhat ironically, he remains as counsel of record for the Debtor in the main case.

fendant readily discarded his obligations to the Debtor. There is no element of provocation by the Debtor towards the Defendant causing the Debtor to deserve such victimization.

Therefore, punitive damages of $31,000.00 would be warranted were it not for our judgment that this sum of compensatory damages would be appropriate. We recognize that we have the discretion to award punitive damages in addition to compensatory damages. However, due to the fact that our compensatory damages were measured by the Defendant's benefit from the transaction rather than the Debtor's losses therein, and recognizing that those losses were minimal because the Debtor would almost certainly have lost the property anyway at Southeast's sheriff's sale of June 17, 1983, we shall not enhance the $31,000.00 awarded. We present this analysis strictly as an alternative basis for reaching the same result.